ALVIN ZELEZNIK, Respondent, v JEWISH CHRONIC DISEASE HOSPITAL, Defendant, and ALCIDES C. POMINA et al., Appellants.

Second Department, March 26, 1975

*James E. Hannon (Norman Bard* of counsel), for appellants.

*Stern, Safran & Gerstner, P.C. (Seymour Stern* of counsel), for respondent.

MARTUSCELLO, Acting P.J. The plaintiff suffered a serious

injury to his right hand following a right brachial angiography administered to discover the cause of a neurological deficit of his left side. By special verdicts, defendants Drs. Pomina and Berman were held liable for lack of the plaintiff's informed consent to the procedure and for negligence in treatment following the angiography. The jury awarded damages of $500,000. These defendants have appealed from so much of the ensuing judgment as is against them based on this award of damages.

We hold that the charge to the jury as to various aspects of the cause of action based on lack of informed consent was incorrect and that the plaintiff failed to prove negligence in the post-angiogram treatment. We further find that the plaintiff's counsel improperly brought to the attention of the jury matter of such prejudicial nature as to have required a mistrial. For all of these reasons we reverse and grant a new trial.

On May 31, 1966 and again on June 22, 1966, the plaintiff felt weakness and numbness in his left arm and leg and upon each of these occasions he consulted his family physician, Dr. Ward. The symptoms on the earlier date disappeared by the time he arrived at his doctor's office. The recurring symptoms of June 22, however, were persistent and Dr. Ward thereupon arranged for the plaintiff's admission on that date to the Wyckoff Heights Hospital.

Defendant Dr. Pomina was called in on June 23 for a neurosurgical consultation. He was employed as a neurosurgical assistant by defendant Dr. Berman. After examining the plaintiff, Dr. Pomina advised him that he should undergo an angiogram procedure which was necessary in order to ascertain what was wrong with him. The plaintiff was willing to do this and on June 26 he was transferred to the Jewish Chronic Disease Hospital for the purpose of having such procedure performed. On June 27 Dr. Berman examined the plaintiff at the latter hospital and advised him that he was in agreement with Dr. Pomina that he (the plaintiff) should undergo an angiogram.

The plaintiff testified that when Dr. Pomina advised that an angiogram be taken Dr. Pomina explained that the procedure was to inject a dye into his arm which would go up through the blood vessels to his head, that X rays would be taken of its path and "in this way * * * there would be a good possibility that they would be able to find out what caused this problem

on my left side." The plaintiff asserted, however, that Dr. Pomina never advised him of any risks inhering in this procedure.

In his pretrial deposition which was read into evidence as part of the plaintiff's case, Dr. Pomina stated that when he recommended the angiogram he told the plaintiff that there was "a certain per cent of risk involved" and that "the neurological deficit could be made worse"; that he did not mention any other risks although he was aware of them; and that, when asked to specify what additional risks there were, stated: "Death, worsening of the neurological condition, including a complete permanent hemiplegia and anaphylactic shock, spasm of the artery, thrombosis of the artery, embolisms, convulsion * * * injury to * * * the median nerve, destruction of the artery on the site of the injection, improper injection technique. There are many others. These are the ones that come to my mind at the moment."

The plaintiff testified that if he had been told of the risks specified in Dr. Pomina's deposition he would not have consented to the angiography. In explaining why he would have refused he said that his "own physical condition was not that critical that would require undergoing the hazards and the risks," that he also "would have wanted to find out if there was some alternate test * * * some other test [that] could be given that would help them to decide what was wrong with me" and that "in addition to this * * * I would want to discuss my own situation with other doctors" and "with my wife."

Drs. Pomina and Berman testified that on separate occasions they told him, variously, that there was "a certain amount of risk"; that "the most common one was the worsening of the neurological deficit that he already has, that usually was transient"; that "this was not a simple and innocuous procedure"; "that the test did carry some inherent risks"; that "the risks, however, were very infrequent. There was a far greater risk in not doing the procedure than in doing the procedure"; and that following the injection there may be a hemiparesis which on rare occasions may be converted into a paralysis, "that this was a possibility, but that this did not occur very frequently. In fact, it was rather uncommon."

The angiogram procedure was performed by Dr. Pomina on June 27, at 4:50 P.M., at the Jewish Chronic Disease Hospital. While the injection of the dye was being done and the X rays

taken, the left side of the plaintiff's body started to convulse. Although the convulsion started to subside, Dr. Pomina terminated the procedure by removing the needle. The plaintiff was then returned to his room and hot compresses were applied to his right arm and hand. At 6:00 P.M., Dr. Pomina noted some improvement in the right arm. At that time he left the hospital to see a patient at another hospital, after leaving instructions for continuous application of compresses and that he was to be notified if the right hand were to become blue, cold or mottled.

While Dr. Pomina was at the other hospital he was notified that the condition had worsened and he returned to the plaintiff's bedside between 7:00 and 7:30 P.M. At about 7:30 P.M. he performed a stellate ganglion block, a procedure involving a local blocking of the nervous system to enervate and thus expand the tightened artery. This caused improvement in that there was some return of the brachial and radius pulses and more blood was flowing into the arm. Nevertheless, he called Dr. Berman and Dr. Rheingold, a vascular surgeon, both of whom arrived at about 9:15 P.M. Dr. Berman noted in the hospital record that "despite good results from a stellate ganglion block, the wrist and lower arm remained cold and mottled; weakness of the small muscles of the hand indicates vascular occlusion of both radial and ulnar arteries. I agree with Dr. Rheingold that exploration is indicated and might [sic] be carried out immediately if the right arm is to be saved."

The exploration of the artery necessitated the calling to duty of operating room nurses who had gone home and the preparation of the operating room and the necessary instruments, and, as a consequence, the operation was not started until about 11:30 P.M. It was performed by Dr. Rheingold, with Dr. Berman and Dr. Pomina assisting. A thrombus was found and removed and the radial pulse reappeared. However, as the incision was being closed the radial pulse disappeared. The artery was again explored. No further clots were found. Thereafter, a further stellate ganglion block was performed.

Nevertheless, the circulation to the right hand did not fully return. The plaintiff ultimately required 23 major surgical operations (not performed at this hospital or by the defendant doctors), resulting in amputation of two fingers and a severely debilitated and deformed hand. Ironically, the neurological deficit of the left side, the investigation of which had necessi-

tated the performance of the angiogram, cleared up in a relatively short time and without any particular medical attention.

The medical witnesses on both sides agreed that the introduction of the injection needle had induced a spasm which had in turn caused occlusion of the brachial artery. Although a thrombus had been removed by Dr. Rheingold, full circulation was not restored because there had developed undissolved thrombotic material in the arterioles closer to the hand which could not be reached. This eventually caused gangrene, requiring the afore-mentioned amputations and resulting in the present mutilated condition of the hand.

At the close of the plaintiff's case, the action as against Jewish Chronic Disease Hospital was dismissed, and the plaintiff does not appeal from the portion of the judgment which is in favor of that defendant. Further, the jury's special verdict as to whether the appellants were negligent in the angiogram procedure itself was in favor of the appellants, and the plaintiff has not raised an issue as to that on this appeal.*

The jury's special verdict was for the plaintiff both on the issues of lack of informed consent and of departure from approved and accepted methods with respect to the post-angiogram treatment and awarded damages of $500,000. We discuss first the verdict as to the post-angiogram treatment.

The plaintiff alleged that the appellants' "delay" until 11:30 P.M. in the surgical exploration of the artery was a proximate cause of his condition. Essentially, it is his position that an emergency situation arose because of the marked loss of circulation to the right hand and that if the surgical exploration had occurred earlier the clot occlusions in the arterioles would not have developed. He contends that waiting as long as the appellants did to see whether circulation would be restored by more conservative methods, and particularly Dr. Pomina's absence from the bedside from 6:00 P.M. to between 7:00 P.M., and 7:30 P.M., constituted negligence in the post-angiogram treatment.

In answer, the appellants state that it is extremely rare, and almost unheard of in medical literature and in their experience, that a spasm at the site of the injection during a

---

* It had been alleged that Dr. Pomina had not in fact immediately removed the injection needle when the convulsion during the angiography was noted. The verdict constituted an acceptance of the defendants' denial of this.

brachial angiogram results in such extensive and persistent blocking of circulation. They also assert that an accepted procedure when a spasm occurs is to apply hot compresses and, if after several hours the spasm is not released, to perform a stellate ganglion block and then again to wait several hours, since within such period circulation is usually restored.

Dr. Pearlman, the plaintiff's medical witness, agreed that surgical exploration is not immediately called for when spasm occurs during brachial angiography; and that it is proper medical practice to wait to see whether the spasm is spontaneously released before performing a stellate ganglion block, and then to wait for an additional period before deciding to perform an exploration of the artery. Although the length of the intervening periods was not agreed upon, Dr. Pearlman did testify that the determination of what was to be done was a matter of medical judgment and he offered no testimony that there had been a specific departure from proper medical practice. He, however, over objection by the appellants, was permitted to answer "Yes" to the following question: "having in mind all of the symptoms and signs I have given you, was the time delay from the time that the symptoms were first noticed until * * * the time that the exploratory occurred a contributing factor towards the plaintiff's present condition?"

The question assumed the very matter in issue, whether the time lapse from 4:50 P.M. to 11:30 P.M., in the light of all the circumstances, constituted a *delay,* i.e., a departure from good medical practice. Certainly the *time lapse* of almost seven hours was a factor in the sequelae, but the plaintiff offered no evidence that it was a departure from proper medical practice to apply graded and sequential conservative measures and to "wait and see" before resort to exploratory surgery, or that, with respect to any particular intervening period, the appellants had acted more slowly than a reasonably prudent neurosurgeon would have under the same circumstances.

The defect in the plaintiff's cause of action for improper post-angiogram treatment is not merely that his medical witness answered "yes" to a conclusory question as to proximate cause of the injury, but also that that testimony did not cure the failure of the plaintiff to show by competent evidence that any of the time lapses between the procedures were improper.

In the interests of justice we preserve this cause of action

for a new trial at which the plaintiff will be afforded an opportunity to submit expert testimony as to whether proper medical practice, in the light of all the circumstances, mandated resort to exploratory surgery at a time substantially earlier than eventuated in this case.

The appellants further contend that the cause of action for lack of informed consent to the angiography must fall because the plaintiff was required to prove that the appellants had failed to make those reasonable disclosures that a physician practicing in the same community would have made under similar circumstances. Although the plaintiff's expert, Dr. Pearlman, had stated that he was familiar with the community practice as to the risks to be imparted to the patient, he did not testify as to what specific risks should have been divulged.

Were we to conclude that the medical community standard controls as to the risks of which the patient is to be informed, we would be required to hold that the plaintiff's proof was inadequate. However, our conclusion is to the contrary.

Risk disclosure is based on the patient's right to determine what shall be done with his body (*Schloendorff v Society of New York Hosp.,* 211 NY 125). Such right should not be at the disposal of the medical community. The physician's obligation is to make reasonable disclosure of the available choices and the potential dangers, and the test of such reasonableness is for the jury to decide. The jury should not be bound by the conclusions of the medical community (*Fogal v Genesee Hosp.,* 41 AD2d 468; *Canterbury v Spence,* 464 F2d 772; *Cobbs v Grant,* 8 Cal 3d 229; *Hunter v Brown,* 4 Wn. App 899). As stated in *Fogal v Genesee Hosp. (supra,* p 473): "The definition of this duty to disclose and its scope have apparently never been explored by the courts of this State. As might be expected, there are conflicting views on the subject in other jurisdictions. Those views are thoroughly analyzed by the Court of Appeals in *Canterbury v Spence* (464 F2d 772). Some jurisdictions have held that the duty to disclose and the required scope of the disclosure must be established by expert medical testimony of the standards of the medical profession. In *Canterbury,* the court held that the duty and scope of disclosure arise apart from medical considerations and are not governed by the profession's standards of due care but by the general standard of conduct reasonable under all the circumstances. This general standard recognizes the patient's prerog-

ative to decide on the projected treatment whereas a medical standard is largely self-serving. We consider the *Canterbury* rule preferable and hold that *a doctor is obliged to divulge to his patient the risks which singly or in combination, tested by general considerations of reasonable disclosure under all the circumstances, will materially affect the patient's decision whether to proceed with the treatment* [emphasis supplied]. This is not a retrospective determination. There should be no criticism of the physician unless the fact-finder determines that the information supplied was unreasonably inadequate *(Canterbury v Spence, supra,* p 787)."

Testimony of a specific medical community standard as to the risks to be divulged is necessarily permeated with self-interest in its attempt to state as concrete what is so nebulous. As stated in *Canterbury v Spence (supra,* pp 783–784), "what in fact is no custom at all may be taken as an affirmative custom to maintain silence, and * * * physician-witnesses to the so-called custom may state merely their personal opinions as to what they or others would do under given conditions." The distractions of a battle between medical witnesses of the opposing parties as to an alleged community standard of disclosed risks have no place in a rational attempt to learn which risks, tested by general considerations of reasonable disclosure under all the circumstances, should have been disclosed as materially affecting the patient's decision whether to proceed with the treatment *(Fogal v Genesee Hosp., supra).*

It was not necessary, indeed it would have been improper, for the plaintiff to offer his expert's personal opinion of the medical community standard as to the risks to be disclosed. Therefore, the plaintiff's proof was not deficient in this respect.

One of the questions submitted for special verdict was: "Would the plaintiff, had he been reasonably informed of the risks or hazards involved in the angiogram procedure which you find should have been disclosed to him, have submitted to the angiogram procedure?" (The jury's answer was "No".) The submission of this question followed the trial court's charge that the plaintiff was required to prove "that had he been so informed he would not have submitted to the proposed angiogram procedure". The appellants contend that this charge and the question as presented were improper and require reversal. We agree.

As we have stated, the duty of risk disclosure serves the

patient's right to decide what shall be done with his body. But whether in fact he would have refused the proposed therapy in the face of known risks is an altogether hypothetical question, i.e., would he have decided differently had he known something he did not know (Waltz and Scheuneman, Informed Consent to Therapy, 64 NW UL Rev 628, 647).

No one, least of all the patient, can answer that question with reasonable certainty and the physician is placed at the mercy of the patient's hindsight. Honest though he may be, the disastrous result of the therapy necessarily affects the patient's guess as to whether the risks, if divulged, would have been acceptable. Especially is this so where the recommended procedure was investigatory and where, as was the case here, the condition sought to be diagnosed healed without treatment. Consideration of the patient's veracity shifts the focus from the time relevant to causation: the juncture at which his consent was given (Waltz and Scheuneman, *supra,* p 646; *Canterbury v Spence,* 464 F2d 772, 790, *supra).*

We hold that the proper rule is to resolve the causality issue on an objective basis, i.e., what a reasonably prudent person in the patient's circumstances would have decided if reasonably informed of the significant perils. The patient's testimony is relevant, but not determinative *(Canterbury v Spence, supra; Fogal v Genesee Hosp.,* 41 AD2d 468, *supra; Cobbs v Grant,* 8 Cal 3d 229, *supra; Funke v Fieldman,* 212 Kan 524).

This cause of action was submitted to the jury on a fundamentally erroneous theory and, in the interests of justice, we can and hereby do reverse and grant a new trial, although no specific exception was taken to the charge *(Carroll v Harris,* 23 AD2d 582; *Hartley v Szadkowski,* 32 AD2d 550; 8 Carmody-Wait 2d, New York Practice § 57:16, p 302), and further because on at least five occasions during this very lengthy trial the appellants' counsel requested the court (without success) to adopt the "reasonable man" or "objective" test as enunciated in *Canterbury (supra).*

An independent basis for reversal was the prejudicial conduct of the plaintiff's counsel as follows: He sought to have Dr. Pomina recognize as authoritative a certain article in a medical journal, which Dr. Pomina refused to do. Then, with the article before him, he asked, "Doctor, isn't it a fact that brachial angiogram has an incidence of 3.9, almost four percent of death? Isn't that a medical statistic?" Objection was

overruled and Dr. Pomina said, "I say that is not so". Then the plaintiff's counsel, upon inquiry by the witness as to which particular complication he was inquiring about, said, "We are talking about death, Doctor", and followed this with: "Well, Doctor, would you like to read from that article which covers the entire range of incidence, Doctor? Would you like to have the jury hear what the incidences are relative to that article?" At this point the court sustained the objection of the appellants' counsel, but denied his motion for a mistrial. Instead, the court instructed the jury "to disregard the question which implies that any such statistic exists". The article was not admitted into evidence.

What makes this egregious is that upon the appellants' counsel's later examination of the article he learned (and stated to the court in the absence of the jury) that it reported that in a series of 538 cerebral angiograms there were *complications* in 3.9% of them, which "included one death, one permanent right hemiplegia and nineteen complications from which the patient recovered after variable periods of time". The plaintiff's counsel's bland response was "Evidently * * * [appellants' counsel] feels it's going to serve his client well. Let's admit it. * * * I offer an offer to * * * [appellants' counsel]. Let's put the article into evidence and you can show the jury everything you just said". This "offer" was refused. The court's response to this information was that the jury would again be instructed to disregard the article and that this admonition would be repeated in the charge. A mistrial was denied.

We deal here with more than the impropriety of calling attention to the hearsay contents of a medical article rejected by the expert who is being cross-examined, an impropriety which standing alone may constitute reversible error *(Wall v Weaver,* 145 Col. 337, Ann. 60 ALR2d 112; 32 CJS, Evidence, § 574[1], p 699). We are dealing with impressing on the jurors' minds that the article contained frightening information when in fact it did not.

We cannot believe that the implicit representation of the death of almost 4% of patients undergoing brachial angiography could be erased from the collective minds of the jury by the trial court's admonition to disregard it. It would be difficult for the jury to believe that this was information arising from counsel's misreading. A mistrial should have been declared.

In view of our determination, we find it unnecessary to consider whether the amount of the verdict was excessive. There should be a new trial on the causes of action of lack of informed consent and malpractice in the post-angiogram treatment.

LATHAM, COHALAN, BRENNAN and BENJAMIN, JJ., concur.

Judgment reversed insofar as appealed from, on the law and the facts and in the interests of justice, and, as between plaintiff and said defendants, action severed and new trial granted, with costs to abide the event.