Hugo Sabatini et al., Appellants, v General Electric Company, Respondent. (Action No. 1.)

Hugo Sabatini et al., Appellants, v Burns & Roe, Inc., Respondent. (Action No. 2.)

Hugo Sabatini et al., Appellants, v Riggs Distler & Co., Respondent. (Action No. 3.)

Second Department, October 24, 1983

APPEARANCES OF COUNSEL

*Ginzburg, Gaines, Gaines, DeBoissiere & Newman* (*Robert J. DeBoissiere* of counsel), for appellants.

*Lester Schwab Katz & Dwyer* (*Harold Lee Schwab* and *Steven B. Prystowsky* of counsel), for General Electric Company, respondent.

*Cusak, Stiles & Hale* (*John P. Hale* and *John F. Kuntz* of counsel), for Burns & Roe, Inc., respondent.

*Newman & Schlau* (*Murray T. Feiden, Richard L. Newman* and *John W. Manning* of counsel), for Riggs Distler & Co., respondent.

OPINION OF THE COURT

RUBIN, J.

Plaintiff Hugo Sabatini, an employee of the Jersey Central Power and Light Co. (JC), was injured on May 8, 1974, when he fell approximately 50 feet from the opening on the second level, to the first level of JC's nuclear power electric generating plant at Forked River, New Jersey. His fall was during the annual close down of the plant for repair, maintenance, and improvements (outage). The plant had been built for JC by General Electric Company (GE) and was put into operation in 1970.

Hugo Sabatini commenced a negligence action, *inter alia,* against GE to recover damages for the personal injuries he allegedly sustained as a result of the fall and his wife brought a derivative action to recover for loss of her husband's services. A bifurcated trial on liability was conducted. At the close of plaintiffs' case the complaint and cross claims against Burns & Roe, Inc. and Riggs Distler & Co. were dismissed. Thereafter, the jury returned a verdict in favor of defendant GE and against plaintiffs. On appeal, plaintiffs contend that the trial court, in essence, charged them out of court. We agree.

Since plaintiffs' appeal is predicated primarily on errors in the court's charge, we have culled only the evidence, at the bifurcated trial, that sheds light on said issue.

THE TRIAL EVIDENCE

After the plant became operational in 1970, JC annually contracted with GE to provide its expertise for the contemplated outage. The contract for the 1974 outage provided that GE "will provide all technical direction and general supervision for the efficient conduct of the jobs". Included among the listed jobs was work relating to "No. 3 and No. 6 CRV [combined reheat valve] valves, No. 3 minor, *No. 6 major*" (emphasis supplied), and job number 37c, described as "Finish grating under the reheat stop valves".[1] The

---

1. "Reheat stop valves" are apparently synonymous with "combined reheat valves" (CRV). The significance of job number 37c is discussed, *infra.*

contract provided that GE's services included the start-up of the "initial turbine-generator unit roll for a period not to exceed forty hours from the initial roll of the turbine-generator unit". Pursuant to the contract, JC would be responsible for and provide, *inter alia,* the tools and equipment for the work, the crane and operator services, the scaffolding and planking, as required, and the "[c]leanup and janitorial services".

The accident occurred in the turbine building, which was approximately 280 feet by 80 feet and had two levels. The upper level (also called the turbine or operating level or floor) was about 50 feet above the lower level (called the condensor bay). Most of the operating floor was made of reinforced concrete but a substantial part consisted of steel plate overlaid on and bolted to the underflooring of horizontal steel beams. The latter type of flooring included plates, each approximately 8 feet by 3 feet, weighing about 480 pounds, around each of the turbine generator's six reheat valves. The massive reheat valves extended vertically from 9 feet above the operating floor level to 6 feet below it.

The original design of the plant contemplated access to the bottom of the reheat valves by the temporary erection of walk-up scaffolding from below. During the 1973 outage (the one just prior to the one at bar), a decision was made by GE and JC to provide access by a ladder from the operating floor down to a platform at the lower end of the number 6 valve to permit work to be performed on it. This required the removal of the 480 pound, 8 feet by 3 feet steel floor plate, surrounding the number 6 valve.

The 1973 plan for permanent access from the operating floor to the bottom of CRV number 6 contemplated the cutting out and hinging of a 3 feet by 2 feet hatch from the 8 feet by 3 feet plate so that it would no longer be necessary to remove the plate itself. This was not done in 1973, and at the end of the outage the 8 feet by 3 feet plate was put back in place.

GE's report to JC of its completed 1973 outage work stated that access to the grating assembly around the reheat valves "was made down the permanent ladder from the turbine elevation. The access hatches with appropriate

rails will have to be made through the existing steel plates". However, at the start of the 1974 outage, the suggested cutting out of an access hatch had not been done, so that if access was to be made to CRV number 6 from above, as in 1973, the lifting of the entire steel plate was again necessary.[2]

Edward Sienkowski, a JC maintenance engineer, called as plaintiffs' witness, testified substantially as follows: he reported to Hugh Scott, a GE engineer at the plant, who assigned him and his crew to work on CRV number 6 when the 1974 outage began. This involved the removal of, and work on, various parts of the valve. They had the crane operator lift the 8 feet by 3 feet plate and this left "quite a large hole, so we turned the plate sideways, but at that it didn't cover the hole. So I had the men lift it up and we put plywood under it and put the plate on top of the plywood". This left a 3 feet by 2 feet opening through which they could descend by ladder to the platform at the lower part of the valve. Safety cones were placed around the opening to which were attached safety ropes. Sienkowski and his crew worked on the valve parts for about three weeks during which time various GE engineers were present. After the valve was reassembled, and after a conversation with a GE engineer, he and his crew left the area. During all of this time, the plate remained in the same position, with plywood on top and underneath it, with the opening surrounded by safety ropes and cones. During this period there were various sections of plywood placed in the area on the concrete and steel portions of the floor. Sienkowski also stated that after he and his crew had finished their work on the valve there was still further work to be done to activate the turbine and that *that* work was not part of JC's job.

Plaintiff Hugo Sabatini testified that he became a JC employee in August, 1973, and that he and Robert Latchaw, his co-worker, were assigned by their JC foreman, Leo Sergevich, to work at the nuclear plant during the 1974 outage. His initial work included bringing stacked lumber, including 4 feet by 8 feet plywood to the

---

2. GE's report to JC of its completed 1974 outage work stated that the "[h]inged access hatches were provided through the steel floor plates." This report was made after the accident.

turbine floor. In the following weeks they worked on the turbine floor on turbine parts and grease fittings, on instructions, variously, from JC or GE personnel. On one occasion plaintiff Hugo Sabatini "came in and there was plywood laid on the floor". Two days before the accident, upon completion of their work on the parts, their foreman, Sergevich, told them "to clean the lumber off the turbine room floor". They proceeded to do this by placing a sling on the center of the turbine floor, picking up the plywood that was on the floor, placing it on the sling, and then when the sling was loaded, signaling to the crane operator who conveyed it to the loading well, down to a trailer where JC employees would put the load on the truck. Then the procedure would be repeated. Sabatini testified that although the crane operator was always a JC employee, there were occasions during the first day of pickup of plywood when they would have to wait their turn for use of the crane because it was being used for work being done or supervised by GE's subcontractor.

Hugo Sabatini further testified that in the course of the second day of their work, he and Latchaw picked up a plywood section and, carrying it horizontally, walked and placed it on the sling. They then returned to pick up a similar plywood section that had been underneath the one they had just moved. Latchaw was on one side and Hugo Sabatini on the other. Sabatini took one step forward and fell 50 feet to the floor below. He was severely injured but survived.

It is uncontested that, at the time, the plate was not covering any part of the 8 feet by 3 feet hole,[3] that the cones and ropes were not in place, and that there was no protective device or sign warning of the hole. It thus appears that, at some point during the interval following the time when Sienkowski and his crew finished their work in the area, and the time when Sabatini and his co-worker started the task of picking up the plywood, the plate had been removed from its position of partially covering the hole so that the hole was now completely uncovered.[4]

---

3. There was testimony that the plate was thereafter seen on the turbine level, but it was not clear just where.

4. It is apparent that its mass and weight required the service of the crane to move it. Since the crane operator did not testify, the reason for its being moved and at whose

Burns & Roe, Inc. codesigned the original construction of the plant with GE and provided the engineering and allied services from the initiation of the project in 1964 to its completion, as a turn-key operation, in 1970. Its "Project Engineer" during the last five years of the construction, Guido Lari, testified that it was dangerous, and contrary to common sense, as well as to the original design intent[5] that whenever the plate might be removed, instead of running the plate back to its normal position, a piece of plywood would be put down to cover the opening.

Joseph Carrol, JC's station superintendent at the plant, testified that major structural alterations therein were done in conjunction with GE personnel. He further testified that, in 1973, work platforms were built to enable workmen to have access to the lower part of the reheat valves. He noted that job number 37, included in GE's contract with JC for 1974, involved the installation of a hatch in the deck plate which would render the removal of the plate unnecessary.

Thomas Collopy, an electrical engineer who was GE's job manager at the 1974 outage, testified that "grating work"[6] around the reheat valves was started in 1973, that the completion thereof in 1973 was not considered a "critical path job" in the sense of having "to be completed in order to get the plant operating", and that it was "an on-going program [for] 1973-74, and thereafter". On cross-examination he testified that further work in the nature of adjustment or calibration would have to be done in connection with CRV number 6 after the valve was reassembled and before the turbine start-up, and the person doing it would have to go down underneath the valve.

THE CHARGE

Just prior to the summations, the court remarked to the jury about the "complexity" of the case but it made no

---

instruction remain a mystery. Nor was there testimony as to who removed the cones and ropes, nor as to when this was done, or at whose direction.

5. Lari stated that the original design intent was "to achieve access [to the valves] by use of scaffolding * * * [f]rom the basement floor up".

6. This allegedly included installation of work platforms under the CRV's and access thereto (at least to CRV number 6) down from the turbine floor.

effort to marshal the evidence.[7] In the course of its charge, it stated: "I will not attempt to marshall the evidence to any extent greater than is necessary to present to you the contentions of the respective parties. The attorneys for both sides have thoroughly reviewed for you the evidence which they felt is relevant in deciding the issues in this case. In any event, it is your recollection of the evidence and not mine which is to be considered by you."

The court stated that plaintiffs' contentions were:

(1) GE was negligent in covering the opening with plywood and in failing to properly supervise the removal of the steel plate, as well as the cones and ropes, and in failing to give adequate substitute warning,

(2) GE had the responsibility to keep the area safe because of its contract with JC which stated that GE would " 'provide all technical direction and general supervision for the efficient conduct of the jobs' ", and

(3) the evidence showed that GE's supervisors were giving direction to Hugo Sabatini's supervisors at JC, so that there was a reasonable inference that GE controlled or directed the clean-up operation in which he was engaged at the time of the accident.

The court, in describing defendant GE's contentions, stated:

(1) GE's duties in the area where the accident occurred were only to provide technical assistance and advice as to the work to be done on CRV number 6, and its work on that valve had been completed approximately three days before the accident,

(2) no proof had been adduced that it in any way supervised or controlled the clean-up operation,

(3) the fact that a hinged hatch covering was installed on the steel plate three weeks after the accident does not indicate that GE had control or supervision in the area at the time of the accident,

(4) the installation of such hatches was an ongoing job over a period spanning several outages, and the failure to

---

7. The trial lasted 16 days. The transcript is 2,110 pages. Plaintiffs introduced testimony and depositions from 16 witnesses and defendants from 8 witnesses.

install it prior to the accident was not a proximate cause of the accident,

(5) it was the responsibility of Hugo Sabatini's employer, JC, to properly safeguard the opening,

(6) GE had no authority, responsibility or control over JC employees assigned to do the cleanup,

(7) if there was negligence, it was that of JC's in failing to conform to existing safety standards relating to temporary floor openings, and

(8) Sabatini was negligent in failing to observe that the steel plate had been removed, and also in failing to walk with the plywood in a vertical position so that he could see where he was walking.[8]

As to GE's duty to safeguard the area, the court charged:

"If you believe the plaintiff's version of this accident, and, if you find that it was G.E.'s responsibility to properly safeguard the temporary floor opening, and that G.E. failed to adequately protect the opening or warn the plaintiff of its existence, then you will find General Electric negligent.

"If you believe defendant's version of this occurrence, and that it had no supervisory control over the clean-up operation at the time of the accident, then you will find the defendant General Electric not negligent."

As to the removal of the steel plate, the court charged:

"I charge you as a *matter of law* that there is no evidence in the case from which you can find that the defendant [GE] in any way directed or controlled the overhead crane with regard to the area of CRV #6. I charge you as a matter of law that there is no evidence in this case from which you can find that the defendant directly installed or removed the plywood, scaffolding with railings, stanchions, colored safety rope, signs and steel plate in the area of CRV #6. You must determine whether the defendant exercised supervisory control over the Jersey Central Power & Light employees who did remove the plywood,

---

**8.** We need not further discuss the issue of contributory negligence. That issue was not reached by the jury because it found for the defendant GE on the first interrogatory (whether defendant GE was negligent), and per instructions, did not consider the remaining interrogatories.

scaffolding, stanchions, colored safety rope, signs and steel plate, if in fact you find that such had been removed at the time of the accident, and whether such removal, without adequate substitute warning, was the proximate cause of the accident to the plaintiff.

"You cannot find the defendant negligent, unless you first find that the defendant *specifically* directed and controlled the removal of the plate, scaffolding with railings, stanchions, safety rope, signs and plywood, or any of them without making provision for substitute safety devices. In this regard, as I previously instructed you, you may not engage in speculation or conjecture as to whether or not the defendant directed and controlled these activities. Plaintiff has the burden of proving these facts by a fair preponderance of the credible evidence.

"If you find that the defendant did not direct or control the clean-up operations in the vicinity of CRV #6, I charge you that you must return a verdict in favor of the defendant and against the plaintiff" (emphasis supplied).

At 4:25 P.M. of the last day of trial, the jurors retired to commence deliberations. At 5:13 P.M., they returned to request an opportunity to examine the GE-JC outage contract, Hugo Sabatini's time sheet on the day of the accident, and a repetition of the explanation of the process of answering the interrogatories. At 5:54 they returned with their answer to the first interrogatory — that GE was not negligent.

THE LAW

The court properly charged that if the jury found that it was GE's responsibility to safeguard the temporary floor opening, and if it further found that GE failed in this responsibility, "then you will find General Electric negligent". However, this issue was definitively eliminated from the jury's consideration by the latter portion of the charge wherein it was stated, firstly, that, "as *a matter of law* * * * there is no evidence * * * that the defendant directly * * * removed the * * * steel plate in the area of CRV #6", and, secondly, "[y]ou cannot find the defendant negligent, unless you first find that the defendant *specifically* directed and controlled the removal of the plate * * *

[and] you may not engage in speculation or conjecture as to whether or not the defendant directed and controlled these activities [the removal of the plate]" (emphasis supplied).

The charge was fatally defective for several reasons. The instruction that "as a matter of law" there was no evidence that GE "directly * * * removed" the steel plate, coupled with the direction that "[y]ou cannot find [GE] negligent, unless you first find that [GE] specifically directed and controlled the removal of the plate," constituted an impermissible direction of a verdict for defendant GE (cf. *Lancaster Silo & Block Co. v Northern Propane Gas Co.,* 75 AD2d 55, 64).

Further, the statement by the court that in lieu of marshaling the evidence in a complex, protracted case, it would state the contentions of the parties, placed the onus on the court to state *all* the contentions of the parties. Otherwise, the jurors would logically assume from such statement that any argument for plaintiffs that was not mentioned in the court's instructions should not be considered. As a result, issues were improperly excluded from the jury's consideration. The jury was not asked to consider whether GE was negligent in providing access to the lower portion of CRV number 6 during the 1974 outage in such manner as to require the detachment and turning around of the 8 feet by 3 feet steel deck plate, thus leaving a partial opening in the floor. Such partial opening was due to the change by GE (albeit with JC's approval) from the original design plan which contemplated access to valves such as CRV number 6 from the condenser floor below, to access from the turbine floor above. It was GE's decision before the 1974 outage work was done that access that year should be from above, despite the fact that installation of the cut-out hinged section in the steel deck plate, which would obviate the need for removal of that plate for such access, was not yet accomplished, although it should have been completed in 1974 by job number 37c. Furthermore, there was testimony by Guido Lari, that the turning around of the plate was dangerous and contrary to common sense. Therefore, there was an issue as to whether GE was negligent in this respect.

Further, the court did not mention the issue of whether GE was negligent in failing to police and safeguard the

opening caused by the turning around of the plate, to insure that the opening continued to have cones and ropes around it, and, further, to insure that the turned around plate was not lifted out of the floor. GE had not completed its job at the time of the accident. The contract required GE to "[p]rovide start-up supporting services" for a period of up to 40 hours from "initial roll of the turbine". There was testimony by Thomas Collopy, GE's job manager at the site, that prior to actual start-up, it might be necessary, after CRV number 6 was returned to its position, to adjust the calibrations of CRV number 6's valves, thus requiring access to the area below the turbine floor. Consequently, there were issues of fact as to whether failure to safeguard the opening during that interval constituted negligence, since the contract required GE to provide "all * * * general supervision for the efficient conduct of the jobs" and, at the time of the accident, there were portions of two listed jobs still to be done by GE, namely, start-up of the turbine, and completion of job number 37c.

Plaintiffs' main theories of GE's liability, stated in the alternative, were:

(1) GE had the responsibility to police the opening and failed in this regard, or

(2) the removal of the plate was at GE's direction. In short, plaintiffs could recover if GE was a negligent watchman for breaching a duty to watch against negligent deeds by others, *or* if GE itself did the negligent deed. The improper effect of the charge, however, was that if plaintiffs failed in proving both their contentions, they must lose.[9] The one-hour deliberation, after this unusually protracted and difficult trial, can thus be understood.

Although the court instructed the jury that "it is your recollection of the evidence and not mine which is to be considered by you", the jurors needed all the help that the court could properly give. The caveat that the court marshal the evidence (see *Green v Downs,* 27 NY2d 205) becomes a mandate when the trial is protracted and diffi-

---

**9.** The error of converting alternative theories of liability to the requirement that *both* be proved is so fundamental and prejudicial that in the interest of justice a new trial is required although no specific exception was taken thereto (see *Zeleznik v Jewish Chronic Disease Hosp.,* 47 AD2d 199, 207; *Anchor Motor Frgt. v Shapiro,* 56 AD2d 573).

cult. The more burdensome to the trial court, the more necessary the marshaling of evidence is for the jury. In view of the serious errors in the charge, a new trial is required.

In connection with the new trial, we should point out that at the close of plaintiffs' case, the court properly dismissed the complaint against Burns & Roe, Inc. (based on alleged design defect of the original construction of the plant) as well as the cross claims against Burns & Roe, Inc. At the same time, the court dismissed the complaint and the cross claims of GE against GE's subcontractor, Riggs Distler & Co. Dismissal of the complaint against Riggs Distler & Co. was also proper since there was no proof that Riggs Distler & Co.'s personnel or the laborers provided by it were involved with the open floor, and Riggs Distler & Co. had not contracted to supervise the outage. However, the dismissal of GE's cross claim against Riggs Distler & Co. should be set aside because at the new trial evidence may be presented that Riggs is liable to GE by reason of indemnification or otherwise. This issue was not litigated at trial because it was rendered academic by the dismissal of GE's cross claim against Riggs Distler & Co. at the close of the plaintiffs' case.

Accordingly, the judgment should be modified, on the law and in the interest of justice, by deleting the first and fifth decretal paragraphs thereof, plaintiffs' action against defendant GE and GE's cross claim against defendant Riggs Distler & Co. should be severed, and a new trial granted in accordance herewith.

BRACKEN, J. P., NIEHOFF and BOYERS, JJ., concur.

Judgment of the Supreme Court, Richmond County, entered September 4, 1980, modified, on the law and in the interest of justice, by deleting the first and fifth decretal paragraphs thereof, plaintiffs' action as against General Electric Co. and General Electric Co.'s cross claim against Riggs Distler & Co. are reinstated and severed. As so modified, judgment affirmed, without costs or disbursements, and a new trial granted in accordance herewith.