KIMBERLY PLANT et al., Appellants, v SHIMON SHALIT, Respondent.

In April 1970 the then seven-year-old plaintiff Kimberly Plant and her parents consulted the defendant Shimon Shalit, a urologist, for treatment of, and possible surgery for, Kimberly's recurrent urinary tract infections. The plaintiffs were referred to the defendant by Kimberly's pediatricians who expressed concern that future infections could result in kidney damage. After considering the child's medical history and performing a physical examination, Dr. Shalit advised Kimberly's parents of his initial impression that their daughter was suffering from meatal stenosis, which would, in all likelihood, require surgery, specifically, a distal urethrotomy. The following month, May, Kimberly was admitted to the hospital, and the surgery was performed. In addition to performing the distal urethrotomy, Dr. Shalit performed a transurethral incision of the bladder neck, after tests which were performed while Kimberly was already anesthetized revealed a bladder neck contracture.

Postoperatively, Kimberly experienced episodes of urgency incontinence which were not alleviated by the passage of time. Dr. Shalit suspected that Kimberly's problem of urine leakage

might be the result of improper scar tissue formation at the operative site. Dr. Shalit further believed that additional surgery would be necessary in order to remove the scar tissue. In March 1971, Kimberly was again admitted to the hospital. A cystoscopy confirmed Dr. Shalit's suspicion that "improper scar formation" was the cause of Kimberly's incontinence and the doctor again recommended surgery in order to, *inter alia,* remove the scar tissue. Kimberly's parents agreed. After the second operation, Kimberly was still partially incontinent. A subsequent cystoscopy revealed that the second operation had been successful in the removal of the scar tissue and that there was good structure in the area of the bladder neck. Dr. Shalit believed that bladder control would be regained with time and recommended that Kimberly remain under his care.

Kimberly did not consult Dr. Shalit thereafter, nor did her incontinence diminish entirely. According to the plaintiffs, Kimberly continued to experience the embarrassment and humiliation of various forms of incontinence during her adolescence and young adulthood. At the time of the trial in 1987, Kimberly suffered from stress incontinence.

The plaintiffs instituted the instant medical malpractice action against Dr. Shalit in 1975. The plaintiffs' principal theory of liability asserted against Dr. Shalit was that he improperly undertook the performance of a transurethral incision of the bladder neck rather than pursuing a more conservative approach and that he negligently performed the operation by excising too much tissue from the area of the bladder neck contracture thereby resulting in the formation of excess scar tissue. The plaintiffs maintained that Kimberly's incontinence was a direct result of the negligent performance of the transurethral incision and that it is a permanent condition. The plaintiffs also asserted claims based on lack of informed consent.

Following a jury trial, a verdict was rendered in favor of Dr. Shalit. On appeal, the plaintiffs contend that the jury's verdict, finding that Dr. Shalit did not commit malpractice in either determining to perform the transurethral incision of the bladder neck or in his performance of the operation, and that Kimberly's parents had given an informed consent to the performance of that procedure, was against the weight of the evidence. We disagree.

It is well settled that a jury verdict in favor of a defendant may not be set aside as against the weight of the evidence unless the jury could not have reached the verdict on any fair interpretation of the evidence *(Nicastro v Park,* 113 AD2d

129). This standard "was intended to accentuate the principle that when a jury, upon being presented with sharply conflicting evidence creating a factual dispute, resolved the controversy in favor of the defendant upon a fair interpretation of the evidence, that finding should be sustained" *(Nicastro v Park, supra,* at 134). Moreover, issues regarding the credibility of expert witnesses are peculiarly within the province of the jury to determine *(see, Gonzalez v Moscarella,* 142 AD2d 550, 551; *Norfleet v New York City Tr. Auth.,* 124 AD2d 715, 716).

We conclude that a reasonable interpretation of the evidence adduced at trial supports the conclusion that Dr. Shalit's determination to surgically intervene to relieve the bladder neck contracture was within the bounds of accepted medical practice at the time the procedure was performed. The plaintiffs' expert, Dr. Reginald Waterhouse, did opine that Dr. Shalit deviated from accepted medical practice in treating the bladder neck contracture surgically rather than pursuing a conservative course of treatment. Dr. Waterhouse testified that the bladder neck condition, if indeed it existed, was secondary to the meatal stenosis and that if the primary condition was relieved by the "benign" distal urethrotomy and treated postoperatively with antibiotics, treatment of the bladder neck contracture was unnecessary, since it would alleviate over time. In contrast, however, Dr. Shalit testified that the procedure was properly undertaken since Kimberly suffered from a congenital bladder neck problem which, contrary to Dr. Waterhouse's claim, would not have been alleviated by the performance of a simple distal urethrotomy, and which, if untreated, could result in chronic urinary tract infections and kidney damage. Additionally, the defendant's expert, Dr. Selwyn Levitt, explained that 1970, when Kimberly's surgery was performed, was an uncertain time in the field of pediatric urology, and that the long-held view that bladder neck contractures were independent entities rather than secondary conditions was increasingly being called into question. Thus, Dr. Shalit's conclusion that Kimberly's problem was a primary one did not constitute a departure from accepted medical standards. Dr. Levitt also opined that, having diagnosed such a condition, Dr. Shalit did not depart from proper medical practice in incising the bladder neck. Dr. Pelligrino Tozzo, a board-certified urologist, who also testified on Dr. Shalit's behalf, testified that in 1970, he performed several operations on young children similar to the one that was performed on Kimberly. He also expressed disagreement with Dr. Waterhouse's view that it would have been more appropriate to only

perform a distal urethrotomy and then prescribe antibiotics. In view of this evidence, we cannot conclude that the jury verdict in Dr. Shalit's favor was against the weight of the evidence.

Similarly, we cannot conclude that the jury's rejection of the plaintiffs' claim—that the defendant improperly performed the transurethral incision by making too large an incision and removing too much tissue—was against the weight of the evidence. On this issue, the jury was called upon to resolve conflicts in the testimony of Dr. Waterhouse and that of Dr. Shalit, the latter of whom explained that he did not incise too much tissue with the cutting instrument, over which he had "perfect control", and that the formation of excessive amounts of scar tissue secondary to the first operation was not attributable to the manner in which he performed the procedure, but rather to Kimberly's unique healing propensities. Based on the record herein, we find no basis to disturb the jury's determination on this issue.

Finally, we decline to disturb the jury verdict in favor of Dr. Shalit on the issue of informed consent. Even assuming that Dr. Shalit failed to disclose to Kimberly's parents the risk of incontinence which was incident to the surgical procedure, the jury could have concluded, based upon a fair interpretation of the evidence, that the risk was not a material one *(see, Zeleznik v Jewish Chronic Disease Hosp.*, 47 AD2d 199).

We have reviewed the plaintiffs' remaining contentions and find them to be without merit. Mollen, P. J., Brown, Kooper and Miller, JJ., concur.