■ CARL DAVIS, Respondent, v NASSAU OPHTHALMIC SERVICES, P. C., et al., Appellants. [648 NYS2d 454] —In an action to recover damages for medical malpractice based upon lack of informed consent, the defendants appeal from a judgment of the Supreme Court, Nassau County (Adams, J.), entered April 5, 1995, which, upon a jury verdict, is against them and in favor of the plaintiff in the principal sum of $800,000.

Ordered that the judgment is reversed, on the law and as a matter of discretion, without costs or disbursements, and a new trial is granted on the issue of damages only, unless within

20 days after service upon the plaintiff of a copy of this decision and order, with notice of entry, the plaintiff serves and files in the office of the Clerk of the Supreme Court, Nassau County, a written stipulation consenting to decrease the verdict as to damages from the principal sum of $800,000 to the principal sum of $400,000, and to the entry of an amended judgment accordingly. In the event the plaintiff so stipulates, the judgment, as so reduced and amended, is affirmed, without costs or disbursements.

In 1980, the defendant Norman O. Stahl performed a radial keratotomy on the plaintiff's left eye to correct his myopic vision. The procedure resulted in "overcorrection" such that the eye became farsighted. The resulting disparity between the left eye and the right eye, which remained myopic, damaged the plaintiff's binocular vision. The jury returned a verdict in favor of the plaintiff on his cause of action for lack of informed consent.

Pursuant to Public Health Law § 2805-d, the plaintiff was required to establish that (1) Dr. Stahl failed to disclose the material risks, benefits, and alternatives to the surgery which a reasonable medical practitioner "under similar circumstances would have disclosed, in a manner permitting [the plaintiff] to make a knowledgeable evaluation", and (2) a reasonably prudent person in the plaintiff's position would not have undergone the surgery if he or she had been fully informed (Public Health Law § 2805-d [1], [3]; *see, Koller v Manhattan Eye, Ear & Throat Hosp.,* 168 AD2d 671, 672). The alleged qualitative insufficiency of the consent must be supported by expert medical testimony *(see,* CPLR 4401-a).

The qualitative insufficiency of the consent in relation to the status of the procedure at the particular time the surgery was performed was supported by the testimony of the plaintiff's expert *(see, Davis v Caldwell,* 54 NY2d 176, 183; *Lipsius v White,* 91 AD2d 271, 280). Further, there was sufficient evidence from which the jury could conclude that a fully informed, reasonably prudent person in the plaintiff's situation would not have undergone the surgery *(see, Koller v Manhattan Eye, Ear & Throat Hosp., supra,* at 672).

The plaintiff's expert, Dr. Ronald Burde, testified that in 1980 radial keratatomy was considered an experimental procedure as it had not been subject to a standard protocol or objective evaluation. In his opinion, to a reasonable degree of medical certainty, the failure to inform a patient that a proposed procedure was experimental constituted a deviation from good and accepted medical practice. While the plaintiff had been

informed that this procedure was "new", a "new" procedure was one which had already gone through the experimental or evolutionary stage. Although Dr. Burde had no knowledge of the sources of information made available to the plaintiff, other than the consent form, there was no testimony that the plaintiff had ever been informed of the experimental nature of the procedure.

In fact, the evidence demonstrates that the procedure was presented to the plaintiff in a very positive light with no suggestion that there were unknown risks. The plaintiff testified that, although Dr. Stahl could not guarantee 20/20 vision, he informed the plaintiff that his vision would improve substantially. The booklet provided by Dr. Stahl described the possible complications of the surgery as a mild infection which could be easily cured with eye drops, and glare, a sensation which usually decreased with time. The remainder of the section on complications noted that the Russian ophthalmologist who developed the procedure "ha[d] not experienced any serious complications that in any way compromised visual acuity" in the more than 2,000 surgeries he had performed. The plaintiff was reassured by the booklet. While the plaintiff discussed the procedure with three of Dr. Stahl's patients who had the surgery, the list of names given to the plaintiff consisted only of satisfied patients. As Dr. Stahl conceded in his testimony, "[y]ou don't submit reference [sic] of people that don't like you and you don't submit reference [sic] of patients that don't like what you've done for them". Under the circumstances, the plaintiff was not permitted "to make a knowledgeable evaluation" (Public Health Law § 2805-d [1]).

The fact that the plaintiff did not specifically testify that he would not have had the surgery had he been informed that the procedure was experimental with unknown risks is not determinative (see, Zeleznik v Jewish Chronic Disease Hosp., 47 AD2d 199, 207). The test is an objective one—what a reasonably prudent person in the plaintiff's circumstances would have decided if reasonably informed (see, Zeleznik v Jewish Chronic Disease Hosp., supra, at 207; Public Health Law § 2805-d [3]).

The prima facie case established by the plaintiff was then further supported by the testimony of the defendants' own expert, Dr. Leeds Katzen. Dr. Katzen testified that, in 1980, a patient should have been informed, not only of everything that was known about the procedure to date, but also that "there might be other things that [could] happen * * * It's an operation that we can't guarantee the result in, that we don't know

enough about it * * * we don't know what can happen". In contrast, Dr. Stahl assured the plaintiff that his vision would improve substantially without informing him that there could be unknown risks.

Accordingly, we find that there was sufficient evidence in the record to support the jury verdict (see, Lipsius v White, supra). Further, the verdict was not against the weight of the evidence as it was based on a fair interpretation of the evidence (see, Nicastro v Park, 113 AD2d 129, 134).

The defendants' claim that errors and omissions in the charge and verdict sheet require reversal is unavailing since the defendants not only failed to except to any of the alleged errors of which they now complain but acquiesced in the submission to the jury of the charge that was given and the verdict sheet (see, Parkin v Cornell Univ., 78 NY2d 523, 530-531; Freidus v Eisenberg, 71 NY2d 981, 982; Syrkett v Burden, 176 AD2d 938, 939-940). Similarly, the defendants made no objection to the various comments made by the plaintiff's counsel in his opening and summation, and while some of the remarks would have been better left unsaid, the cumulative effect of those comments and that portion of the cross-examination of Dr. Katsen to which the defendants objected was not so egregious as to warrant reversal.

We do find, however, that the amount of damages awarded to the plaintiff deviates materially from what would be reasonable compensation, and is, therefore, excessive to the extent indicated (see, CPLR 5501 [c]). Miller, J. P., O'Brien and Altman, JJ., concur.

Sullivan, J. dissents and votes to reverse the judgment appealed from and to dismiss the complaint with the following memorandum: This medical malpractice action was tried in 1995, but was based upon a surgical procedure, radial keratotomy (hereinafter RK), performed on October 18, 1980. The plaintiff commenced the action in December 1982. The complaint set forth four causes of action: (1) failure to provide medically proper treatment, (2) failure to obtain the plaintiff's informed consent, (3) fraud, and (4) breach of contract. During the subsequent trial, at the close of the plaintiff's case, the parties stipulated, inter alia, that the first, third, and fourth causes of action would be discontinued with prejudice. Hence, the case proceeded to judgment solely upon the theory of lack of informed consent. As the majority has indicated, the jury returned a verdict in favor of the plaintiff. For the reasons stated below, I would reverse the judgment and dismiss the sole remaining cause of action.

## I

The trial testimony demonstrated that in 1980, the plaintiff, a resident of Connecticut, was 34 years of age. He was well educated, having acquired a B.A. in Psychology and an M.A. in Social Work. He also had been a social worker in the Stamford school system for five and one-half years, and thereafter operated a dance studio. The plaintiff suffered from myopia (nearsightedness) and had worn glasses and contact lenses since his high school years.

In March 1980, the plaintiff saw an interview of the defendant, Dr. Stahl, and professor S.N. Fyodorov, the Russian physician who developed RK, by Frank Field on NBC television. The plaintiff became interested in the procedure because he had long wanted improved vision without having to wear glasses or contact lenses. Although he wrote down Dr. Stahl's telephone number at that time, he did not call for six months. In the interim, he spoke about RK to an ophthalmologist whom he knew in Connecticut, who told the plaintiff that it was a new procedure and that he did not know much about it. Accordingly, the plaintiff tried to learn more about RK.

In September 1980, the plaintiff called Dr. Stahl's office seeking information about the procedure. He was given the names of three patients upon whom Dr. Stahl had previously operated. The plaintiff spoke to all three and discussed the results of their surgery. He also called one of those patients both before and after the RK procedure was performed on her second eye.

At the time of the telephone call in September 1980, an appointment was made for an examination of the plaintiff by Dr. Stahl on the evening of October 17, 1980, and the procedure was tentatively scheduled for the next morning. The plaintiff also received a twelve-page booklet from Dr. Stahl entitled "EXPLANATION OF CORNEAL PLASTIC MICROSURGERY FOR THE CORRECTION OF MYOPIA (NEAR-SIGHTEDNESS)", which he read. At the October 17th meeting, Dr. Stahl spoke to the plaintiff and a group of six or seven others who were considering the procedure. Dr. Stahl also discussed the risks attendant to the surgery with the group. He then examined the plaintiff's eyes and they had a private discussion in which the doctor answered the plaintiff's questions about risks and the procedure was definitely scheduled for the following morning.

On October 18, 1980, Dr. Stahl performed the RK procedure on the plaintiff's left eye. Prior to the surgery, the plaintiff read and signed a consent form which he readily understood. That consent form described RK as "a new operative procedure" and listed "impaired vision" among the possible known

risks. When the bandages were removed two days later, he was farsighted in the left eye. This condition continued through July 22, 1981, the last date on which the plaintiff saw Dr. Stahl. During this period, the doctor referred the plaintiff to various specialists without any resulting improvement.

## II

A cause of action based on lack of informed consent is premised on Public Health Law § 2805-d, which provides in relevant part as follows:

"1. Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical, dental or podiatric practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation * * *

"3. For a cause of action therefor it must also be established that a reasonably prudent person in the patient's position would not have undergone the treatment or diagnosis if he had been fully informed and that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought."

A leading commentator has summarized a plaintiff's burden in establishing a cause of action sounding in lack of informed consent as follows: "Initially the plaintiff must prove that the doctor failed to apprise him of the reasonably foreseeable risks of the treatment or procedure contemplated. Second, the plaintiff must prove that having been fully informed of the risks or alternatives, a reasonable person in the plaintiff's position would have opted against the procedure or treatment * * * The plaintiff may, but does not necessarily have to testify that he would not have consented to the treatment or procedure if adequately informed * * * Third, that the procedure was a proximate cause of the injuries." (1 Bard and Marano, New York Medical Malpractice § 2.1, at 2-7 [rev ed 1994].)

This case is atypical of those involving claimed lack of informed consent in that there is no question of fact as to what information was provided to the plaintiff prior to the procedure. The plaintiff admitted that he read the booklet and the consent form which set forth that this was a new procedure developed by professor Fyodorov in 1972, that Fyodorov had performed more than 2,000 such procedures without serious complications that compromised visual acuity, and that American ophthalmologists had been invited to work with Fyodorov

in February 1980. In addition, and most significantly, Dr. Stahl spoke to the plaintiff and other patients collectively and individually on October 17, 1980, about the known risks of the procedure. Indeed, the plaintiff agreed with Dr. Stahl's version of their conversations.

Since there is no question as to what was disclosed by the doctor before the surgery, the plaintiff was required to demonstrate either that there was an alternative to the proposed procedure which the defendants should have revealed to him *(see, Eppel v Fredericks,* 203 AD2d 152), or that there was a material risk in the procedure which was *reasonably foreseeable* and which was not disclosed. However, in an effort to establish liability on the latter basis, the plaintiff and his medical expert set forth entirely different claims regarding the alleged "risks" of RK which were not disclosed by the defendants.

When the plaintiff testified, he was questioned at length as to whether Dr. Stahl had advised him of the risk which actually occurred in this case—permanent overcorrection of his left eye. The questions put to the plaintiff by his attorney were carefully crafted to relate only to *permanent* overcorrection. In fact, the RK procedure involves deliberate overcorrection in order to compensate for the healing process, during which the cornea seeks to resume its earlier shape. This was considered a temporary condition that would disappear after a few months. The plaintiff's own testimony established that Dr. Stahl had discussed with him that there would be a *temporary* period of overcorrection or farsightedness after the surgery:

"Q. Sure. After your surgery, say when they took the bandage off?

"A. Two days later?

"Q. Okay. There was an overcorrection; correct?

"A. Correct.

"Q. At that point you weren't surprised, Dr. Stahl wasn't surprised?

"A. No, that's correct.

"Q. That was something that was expected?

"A. That's correct.

"Q. *That was something you were warned might happen; correct?*

"A. *That's correct."* (Emphasis supplied.)

It was the failure to disclose the specific risk of *permanent overcorrection* which the plaintiff claimed in his testimony constituted the "but for" element of this case *(Flores v Flushing*

*Hosp. & Med. Ctr.,* 109 AD2d 198, 200). In other words, had a reasonably prudent person been informed of the risk of permanent overcorrection, he would not have consented to undergo the procedure. Indeed, the plaintiff's own testimony left no doubt in this regard:

"Q. * * * Had you been advised that one possibility was permanent overcorrection which would result in you being farsighted in the opposite eye, would you have undergone the procedure?

"A. Like I said, never. I would have never considered the operation".

However, the absence of a legal duty to disclose that which is not reasonably foreseeable is fatal to this claim.

Dr. Stahl testified that he was surprised that the plaintiff's cornea did not "rebound", and that this was the first instance of a condition of permanent overcorrection in both his experience and professor Fyodorov's experience. This testimony was not refuted. Furthermore, permanent overcorrection was not a recognized risk of RK until the mid 1980s. Indeed, the court subsequently charged on two occasions that "[i]t is undisputed that the defendant [Dr. Stahl] was not even aware of the possible complication of overcorrection". Since the doctor was not aware of the risk of permanent overcorrection in 1980, and there was absolutely no evidence that such a risk was known anywhere in the medical community, that risk clearly could not be considered reasonably foreseeable. Indeed, Dr. Stahl could not be charged with the responsibility to disclose that which he did not know or which was not reasonably foreseeable.

### III

The testimony of the plaintiff's medical expert stood in sharp contrast to that of the plaintiff himself, and failed to make out a viable informed consent claim. In 1975, in an effort to curb the proliferation of actions sounding in lack of informed consent when plaintiffs could not establish negligent malpractice, the Legislature enacted CPLR 4401-a, which requires expert medical testimony in such cases: "A motion for judgment at the end of the plaintiff's case must be granted as to any cause of action for medical malpractice based solely on lack of informed consent if the plaintiff has failed to adduce expert medical testimony in support of the alleged qualitative insufficiency of the consent."

The expert medical testimony which the plaintiff presented

in this case was at odds with his own testimony. The plaintiff's expert, Dr. Burde, never addressed the plaintiff's claim that Dr. Stahl should have disclosed the unknown risk of permanent overcorrection. Accordingly, that claim cannot sustain the cause of action for lack of informed consent *(see, Briggins v Chynn,* 204 AD2d 158; *Innucci v Bauersachs,* 201 AD2d 460; *Evans v Holleran,* 198 AD2d 472; *Hylick v Halweil,* 112 AD2d 400). Rather, Dr. Burde's testimony was limited solely to whether the consent form alone contained sufficient information on which the plaintiff could make an informed consent. He found that it did not based on his opinion that RK was an "experimental" procedure and that under such circumstances, a physician was obligated to advise a patient that the proposed procedure was "experimental". However, Dr. Burde conceded that he did not consider other sources of information made available to the plaintiff: "I wasn't there and I don't know if anything was added at the time that this was taken". Moreover, on cross-examination, Dr. Burde was asked about each statement in the consent form and he admitted that the words "new procedure" used in the consent form could apply to something that had been "experimental" but which "had gone through an evolutionary stage".

The plaintiff's expert further admitted that it was common practice for ophthalmologists to give information verbally in addition to supplying the written consent form. Both the plaintiff and Dr. Stahl testified that such oral information was given on the evening before the surgery. In the course of that oral exchange, the plaintiff was informed about the anticipated temporary overcorrection. He was not told about a risk of permanent overcorrection because, as all parties agree, that was not known to be a reasonably foreseeable material risk of the procedure in 1980. By limiting his testimony solely to the written consent form and failing to consider the oral information which concededly was communicated to the plaintiff, Dr. Burde did not establish the qualitative insufficiency of the consent as required by CPLR 4401-a.

Additionally, and perhaps most significantly, Dr. Burde's testimony failed to support the plaintiff's own claim regarding lack of informed consent. The plaintiff testified that his consent was insufficient because he was not informed of the specific risk of permanent overcorrection. Dr. Burde did not reach the same conclusion because he could not, since permanent overcorrection concededly was not a reasonably foreseeable risk of RK at the time of the plaintiff's operation. Rather, he testified to the legally unsupportable proposition that Dr. Stahl

should have informed the plaintiff that the procedure was "experimental", which in Dr. Burde's opinion necessitated a vague and unspecified "broader and more exacting" informed consent "because of the unknown involved". In so testifying, Dr. Burde contradicted the established principle that a physician need not warn about any and all possible risks, known or unknown, but only of those known risks which are reasonably foreseeable (see, Public Health Law § 2805-d [1]; Cummings v Fondak, 122 Misc 2d 913).

In short, the plaintiff clearly knew from the consent form, his discussion with Dr. Stahl, the literature he received from Dr. Stahl, the television report he watched, and his discussion with his own ophthalmologist, that the RK procedure was new. He never testified that he would have declined the operation if the word "experimental" had been substituted for the word "new" in the consent form. In fact, he never mentioned the word "experimental" during his lengthy testimony, relying instead upon his claim that Dr. Stahl should have warned him of permanent overcorrection. Conversely, the plaintiff's medical expert focused entirely on the absence of the word "experimental" from the consent form, even though he never adequately defined that term or explained how it differed from the word "new". Inasmuch as this purported flaw which Dr. Burde found in the consent form did not correspond to the plaintiff's claim that he should have been warned of permanent overcorrection, the testimony of these two witnesses never coincided and a viable lack of informed consent claim was never made out. Since there was no medical testimony properly supporting a claim of qualitative insufficiency of the consent, the defendants' motion for judgment as a matter of law at the conclusion of the entire case should have been granted (see, CPLR 4401, 4401-a; Briggins v Chynn, 204 AD2d 158, supra; Innucci v Bauersachs, 201 AD2d 460, supra; Evans v Holleran, 198 AD2d 472, supra; Gonzalez v Moscarella, 142 AD2d 550; Hylick v Halweil, 112 AD2d 400, supra; cf., Koller v Manhattan Eye, Ear & Throat Hosp., 168 AD2d 671). I would therefore reverse the judgment and dismiss the complaint.