Ruth Lipsius et al., Appellants, v A. Burton White, Respondent.

Second Department, January 24, 1983

APPEARANCES OF COUNSEL

*Milton S. Teicher* for appellants.

*Leahey & Johnson, P. C.* (*Peter James Johnson* and *Michael Conforti* of counsel), for respondent.

OPINION OF THE COURT

Boyers, J.

This is an action to recover damages for personal injuries based upon the alleged medical malpractice of the defendant physician, Dr. White, who in August, 1976 operated upon plaintiff Ruth Lipsius' right hand to relieve her of symptoms which he had diagnosed as evidencing carpal tunnel syndrome, a pathological process defined by Dr. White at trial as compression symptoms on the median nerve.[1] As a result, Mrs. Lipsius claims that the use of her right hand is permanently impaired.

---

1. Carpal tunnel syndrome may be clinically defined as "a complex of symptoms resulting from compression of the median nerve in the carpal tunnel, with pain and

In February, 1977 plaintiffs commenced the instant action, the complaint alleging three causes of action. By the first cause of action, as amplified by their bill of particulars, the plaintiffs sought recovery based upon allegations, *inter alia,* that (1) the surgery undertaken by Dr. White was unnecessary, and (2) in performing the operation, Dr. White negligently damaged and severed the palmar cutaneous branch of the median nerve of Mrs. Lipsius' right hand. Further, plaintiffs claimed that Dr. White failed to order proper and adequate diagnostic tests to determine the true etiology of the presenting symptoms, including electromyogram and nerve conduction tests, particularly in light of the results of earlier tests which tended to reject Dr. White's diagnosis of carpal tunnel syndrome. Plaintiffs' second cause of action was predicated upon the theory of lack of informed consent, and in a third cause of action plaintiffs sought damages for Mr. Lipsius' loss of services, etc.

At trial, Dr. White testified that he first saw Mrs. Lipsius with respect to her hand on December 17, 1973, his medical record reflecting the following entry for that day: "About six weeks ago started to get burning in the right hand, severe burning and numbness in the fingers. She went to Dr. M. Green, who thought it was a cervical thoracic syndrome. EMG and cervical spine x-rays were negative. Was advised [by Dr. Green] she had a thoracic outlet syndrome and should have the first rib removed." Dr. White agreed that carpal tunnel syndrome and thoracic outlet syndrome could produce similar symptoms. Additionally, tests conducted in December, 1973 by a Dr. Post, who performs electromyography and electroconduction studies, led that physician to the clinical impression that the etiology of Mrs. Lipsius' problem was scalenus syndrome and not carpal tunnel syndrome, the former condition being described by Dr. White as "thought to be a compression of the blood vessels that course underneath the * * * scalenus anticus muscle * * * a neck muscle that attaches to the clavicle". Dr. White explained that scalenus syndrome could produce symptoms similar to those pre-

burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow" (Dorland's Illustrated Medical Dictionary [26th ed, 1981], p 1289).

sented by both thoracic outlet syndrome and carpal tunnel syndrome.

Dr. Howard Balensweig, a board certified orthopedist, called on plaintiffs' behalf, testified as to accepted standards of medical practice thus:

"Q * * * Doctor, do you have an opinion, with respect to what is good medical practice, as to what tests should be performed by a physician, before operating on a patient for carpel tunnel syndrome?

"A I do * * *

"Q 1976, what was good and accepted medical practice at that time, with respect to this type of surgery?

"A To order nerve conduction and electromyographic studies of both upper extremities, prior to surgery, in order to establish the diagnosis of carpal tunnel syndrome and also to judge the severity of it * * *

"Q Can you state, with reasonable medical certainty, whether or not it was good and accepted medical practice for Dr. White to have operated on Mrs. Lipsius, on August 2, 1976, for carpal tunnel syndrome without having taken a nerve conduction test and an EMG * * *

"A It is [sic] improper to operate without having these tests done, at that time, in '76.

"Q And is it improper, today, also?

"A It is."

Dr. Balensweig agreed that Dr. Post's December, 1973 study indicated no median nerve entrapment. It is never possible, the witness stated, for carpal tunnel syndrome to be present when there is a negative nerve conduction test. Based upon this expert's reading of the preoperative hospital record, he concluded, with a reasonable degree of medical certainty, that Mrs. Lipsius was not suffering from carpel tunnel syndrome at the time she was admitted to the hospital for the surgery in question.

With respect to the theory that Dr. White had severed the palmar cutaneous branch of the median nerve, Dr. Balensweig opined, with a reasonable degree of medical certainty, that the symptoms exhibited postoperatively resulted from the partial or complete division of that nerve rather than its entrapment by scar tissue.

Pursuant to subdivision 8 of section 148-a of the Judiciary Law, plaintiffs introduced into evidence at trial the formal written recommendation of the medical malpractice mediation panel. The panel, which was composed of a board certified orthopedic surgeon, a Justice of the Supreme Court and an attorney, had rendered a unanimous recommendation that there was liability on the part of the defendant physician for medical malpractice, but did not indicate the specific basis for such finding. While the recommendation was supportive of plaintiffs' position, those panel members permitted by statute[2] to testify were not called, either by plaintiffs in support, or by defendant in an attempt to diminish the negative effect of the recommendation.

The trial testimony of Dr. J. William Fielding, a board certified orthopedic surgeon, called in defendant's behalf, controverted that of plaintiffs' expert, both as to the proper preoperative diagnosis and as to the manner in which the operation was executed. It was Dr. Fielding's conclusion that Dr. White had in all respects followed good and accepted medical practice. Moreover, based upon this expert's review of the medical records, defense counsel elicited testimony regarding a fall Mrs. Lipsius had sustained about a year after undergoing the surgery at issue, which incident had resulted in her hospitalization. X-ray films taken at that time demonstrated, *inter alia,* a fracture of the navicular (or scaphoid) bone in Mrs. Lipsius' right wrist. It was Dr. Fielding's opinion that symptoms referable to such an injury are similar to those of carpal tunnel syndrome and that sequelae of the former were sufficient to constitute the competent producing cause of the injuries complained of. Based upon the afore-mentioned, it was defendant's position at trial, *inter alia,* that plaintiffs had failed to adduce expert medical testimony sufficient to establish a causal nexus between the alleged malpractice and Mrs. Lipsius' alleged injuries.

---

**2.** Subdivision 8 of section 148-a of the Judiciary Law provides in pertinent part: "If the recommendation [of the panel] is read to the jury * * * the doctor member or the attorney member of the panel, or both of them, may be called as a witness by any party with reference to the recommendation of the panel only".

Relevant to Mrs. Lipsius' claim founded upon the doctrine of lack of informed consent was her trial testimony concerning a visit she made to Dr. White's office on June 8, 1976, at which time she complained of "tingling" in her hand and Dr. White proposed surgical intervention. The record reads thus:

"Q * * * [W]hen you told * * * the doctor [about her current complaint] what did he say?

"A He said it was ridiculous for me to continue going on this way. And that he felt, that I should have surgery and get rid of this condition once and for all.

"Q What did you say * * *

"A I told him, I did not like the idea of surgery; could we do something else. I asked about medication * * * anything except surgery * * * I was using my hand. I was not troubled with it. It did not incapacitate me and I just did not want to go through surgery unless it was necessary. And I didn't know why it was necessary, if I had no problems for at least a year and a half before this.

"Q All right. What did the doctor say to you?

"A [He] said, that it was going to get much worse and that soon, no one will be able to help me; it will be irreversible and that I was very foolish. And it is a very simple operation. And I would be working in two or three weeks and not to worry about it * * * I asked him, again, could we try medication or maybe another injection like I had gotten a year and a half before * * * he said, no. He would not give me another injection in the wrist. And if I did not want to go through with the surgery, if I did not make an appointment for the surgery that day, not to come back to him as a patient because that was what he felt I needed and he did not want to discuss it."

As to whether Mrs. Lipsius would have undergone the surgery complained of had she been fully informed, the following was asked of her and answered:

"Q * * * If you had known, prior to the surgery, that you were going to have the problems with your hand postoperatively, would you have consented to the surgery?

"A No sir."

In support of the alleged qualitative insufficiency of the consent to surgery (see, generally, CPLR 4401-a[3]), Dr. Balensweig testified that it was good and accepted medical practice to inform a patient what risks, if any, are associated with surgery for carpel tunnel syndrome, including the known risk of "[d]amage to the cutaneous branch of the median nerve to the base of the palm, [d]amage to the median nerve and, additionally, [the] *chance that the patient may or may not be improved by the surgery*" (emphasis supplied).

Prior to summation, at the close of all the evidence in the case, the trial court granted defendant's motion to dismiss the complaint, based (it would appear from the transcript) upon plaintiffs' failure to establish a prima facie case.

For the reasons delineated hereinafter, we cannot agree that the trial court properly dismissed the complaint, thereby determining that defendant was entitled to judgment as a matter of law, but rather, we find that there was introduced at trial sufficient evidence for submission to the jury on the theories of unnecessary surgery and uninformed consent.

A motion for judgment at the close of all the evidence is substantially equivalent to one for a directed verdict made at that point (*Morrello v Saratoga Harness Racing,* 50 AD2d 950; *Aetna Cas. & Sur. Co. v Garrett,* 37 AD2d 750; *Wessel v Krop,* 30 AD2d 764, 765; 4 Weinstein-Korn-Miller, NY Civ Prac, par 4401.01). In reviewing the dismissal of a plaintiff's complaint, this court is required (as was the trial court) to view the evidence in the light most favorable to the plaintiff (*Singer Co. v Stott & Davis Motor Express,* 79 AD2d 227, 230; *Bradshaw v Paduano,* 55 AD2d 828, 829; *Braunstein v Robinson,* 47 AD2d 700; *Calvaruso v Our Lady of Peace R.C. Church,* 36 AD2d 755), and all questions as to witnesses' credibility must be resolved in plaintiff's favor (see *Hurder v Kosoff & Sons,* 23 AD2d 804). In considering a motion for a directed verdict, the test to be applied is not founded upon a weighing of the evidence, but rather, in taking the case from the jury, the trial

---

**3.** CPLR 4401-a, applicable to causes of action arising after July 1, 1975, requires that a plaintiff adduce expert medical testimony "as to any cause of action for medical malpractice based solely on lack of informed consent".

court must find "that by no rational process could the trier of the facts base a finding in favor of the [plaintiff] upon the evidence * * * presented" (*Blum v Fresh Grown Preserve Corp.,* 292 NY 241, 245; *Aetna Cas. & Sur. Co. v Garrett, supra,* p 751).

Turning to the specific facts at bar, and more particularly to that part of the first cause of action in the complaint alleging unnecessary surgery, in our opinion the testimony of Dr. White himself, that of Mrs. Lipsius and that of her medical expert clearly constituted sufficient evidence for that theory of liability to be submitted to the jury.

The essential issue is whether "the plaintiff established that what the defendant did or failed to do in his treatment of plaintiff constituted a departure from the applicable standards of medical skill and care" (*Spitzer v Ciprut,* 80 AD2d 891). Additionally, while it is true that where medical malpractice is alleged expert opinion is required to "establish proximate cause and make out a prima facie case * * * unless the causal relationship is readily apparent to the trier of fact" (*Monahan v Weichert,* 82 AD2d 102, 107), it is not necessary that a plaintiff's expert specifically enunciate the code words "proximate cause".

With respect to plaintiffs' claim alleging unnecessary surgery, their expert testified, *inter alia,* that: (1) in his opinion, with a reasonable degree of medical certainty, an examination of the preoperative hospital record indicated that Mrs. Lipsius was not suffering from carpal tunnel syndrome at the time defendant performed the surgery at issue, and (2) it was a deviation and departure from accepted standards of medical practice to perform the operation without first performing electromyographic and nerve conduction tests of both upper extremities, particularly in view of the fact that such tests had proven negative on a prior occasion. Based upon the afore-mentioned, there was sufficient proof adduced at trial to support a finding that Dr. White had deviated from accepted standards of medical practice by, *inter alia,* failing to perform certain preoperative diagnostic tests and thereby comprehend the true nature of the symptoms presented, and that such departure proximately caused the undertaking of an operation which

should never have been recommended or undertaken (cf. *McDermott v Manhattan Eye, Ear & Throat Hosp.,* 15 NY2d 20, 24).

An additional factor bearing upon the existence of a triable issue of fact as to medical malpractice based upon unnecessary surgery, was the admission into evidence at trial of the medical malpractice panel's unanimous recommendation that there was liability on the part of defendant. While a panel recommendation is not binding upon the jury in that it is not conclusive as to the issue of liability at trial, a jury may give whatever probative value it believes ought to be afforded such recommendation (Judiciary Law, § 148-a, subd 8; *Curtis v Brookdale Hosp.,* 62 AD2d 749, 753). This view comports with the objective of subdivision 8 of section 148-a of the Judiciary Law, which was added by amendment in 1975 (L 1975, ch 109, § 16) and allows, *inter alia,* for the introduction into evidence of a unanimous panel recommendation, which objective "could only have been to assist the triers of fact in reaching a verdict", even though such recommendation "was not intended to replace the jury's verdict" (*Bernstein v Bodean,* 53 NY2d 520, 527). In the case at bar, the admission into evidence of the unanimous panel recommendation that defendant was liable resembles the admission of expert opinion (cf. *Comiskey v Arlen,* 55 AD2d 304, 315, affd 43 NY2d 696) to be evaluated by the jury and given its proper weight in accordance with instructions from the court, at the time of its admission and upon the court's charge, as to its significance (cf. *Bernstein v Bodean, supra,* p 529; see, e.g., sample charges PJI 2:151A, 2:151A.1, 1982 Cum Supp, pp 168-169). Mindful then, that plaintiffs must be afforded the most favorable view of the evidence, in our opinion the unanimous panel recommendation that defendant was liable for medical malpractice, when considered with all the evidence in the case including the testimony of plaintiffs' expert, provided sufficient basis for a jury determination as to whether, *inter alia,* defendant's alleged failure to utilize proper testing procedures resulted in the negligent preoperative diagnosis of a surgical condition where no operative intervention was indicated (cf. *Brown v City of New York,* 47 NY2d 927, 928).

However, plaintiffs' expert's conclusion that Dr. White acted negligently in that he cut the palmar cutaneous branch of the median nerve is not supported by the record. Such determination was made solely upon Dr. Balensweig's postoperative evaluation of symptoms which could clearly have been attributable to other factors, for example, the wrist injury Mrs. Lipsius sustained approximately one year after the operation. It is well established that "opinion evidence must be based on facts in the record or personally known to the witness * * * He cannot reach his conclusion by assuming material facts not supported by [the] evidence" (*Cassano v Hagstrom,* 5 NY2d 643, 646; *Tactuk v Freiberg,* 29 AD2d 868, revd on other grounds 26 NY2d 757; see *Filanowicz v Guarino,* 27 AD2d 666). At bar, there being no evidentiary basis in the record for Dr. Balensweig's assumption, such opinion must be characterized as speculative and without foundation.

As to the cause of action for lack of informed consent, based upon Mrs. Lipsius' testimony and that of her medical expert we find sufficient proof in the record to satisfy the statutory requirements of section 2805-d of the Public Health Law[4] for the purpose of raising a factual issue for the jury's determination.

---

4. This State's statutory codification of the doctrine of informed consent (Public Health Law, § 2805-d) applicable to those causes of action accruing on or after July 1, 1975, follows the objective majority rule, and measures the reasonableness of risk disclosure by a professional standard, that of the reasonable medical practitioner under the same or similar circumstances (see 27 Syracuse L Rev 425, 430-431; see, generally, Modern Status of Views as to General Measure of Physician's Duty to Inform Patient of Risks of Proposed Treatment, Ann., 88 ALR3d 1008, 1012, 1028; see, also, 27 Syracuse L Rev 657, 744-745). The statute, which limits the right to bring an action based upon the theory of lack of informed consent to those cases involving either "non-emergency treatment. procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body", provides in pertinent part (Public Health Law, § 2805-d):

"1. Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternative thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation * * *

"3. For a cause of action therefore it must also be established that a reasonably prudent person in the patient's position would not have undergone the treatment or diagnosis if he had been fully informed and that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought."

The duty to disclose risk is based upon a patient's right to determine what shall be done with his body (*Schloendorff v Society of N.Y. Hosp.*, 211 NY 125; see *Burton v Brooklyn Doctors Hosp.*, 88 AD2d 217, 225-226). It is the physician's obligation to furnish a reasonable explanation of the available choices and potential dangers, the test of such reasonableness being for the jury to determine (*Zeleznik v Jewish Chronic Disease Hosp.*, 47 AD2d 199, 205). While Mrs. Lipsius' version of the conversation with defendant was controverted in significant part by the defendant, such conflict simply presented a question of credibility and had no bearing on the issue of whether plaintiffs had made out a case for submission to the jury on the claim of lack of informed consent (*Davis v Caldwell,* 54 NY2d 176, 182-183, n 6).

Her testimony, that if she had known prior to the surgery of the problems that she might experience with her hand postoperatively, she would not have consented, taken with that of her medical expert (in support of the alleged qualitative insufficiency of the consent [see CPLR 4401-a]), that defendant should have informed his patient that she might or might not improve as a result of the surgery, raised a question of fact for the jury on this issue. This is so, even though the court, in submitting the case to the jury, would have had to charge that plaintiffs must establish, *inter alia,* "by a preponderance of the evidence * * * that a reasonably prudent person in the patient's circumstances would have refused to undergo the procedure if reasonably informed of the significant perils" (*Proce v Franklin Gen. Hosp.,* 83 AD2d 903, mot for lv to app den 55 NY2d 603; *Zeleznik v Jewish Chronic Disease Hosp., supra,* p 207). Of course, upon a new trial the court should additionally charge the jury, *inter alia,* that "[i]f [it found] that [defendant] failed to give plaintiff all the information that a reasonably prudent medical practitioner would have given his patient to make [her] aware of the risks and benefits of, and alternatives to, the (operation * * *) * * * and that the (operation * * *) had such an effect in producing plaintiff's (injury * * *) that reasonable men would regard it as a cause of the (injury * * *)" its verdict should be for the

plaintiffs (PJI 2:150B, 1982 Cum Supp, pp 162-163). "The patient may always choose between two apparent dangers, one attendant upon surgery, the other resulting from the continuation of an existing condition because of a decision not to undergo surgery" (*Fogel v Genesee Hosp.*, 41 AD2d 468, 474).

Accordingly, having found that plaintiffs adduced sufficient evidence at trial with respect to the theories of unnecessary surgery and lack of informed consent to withstand defendant's motion to dismiss, the judgment appealed from should be reversed, on the law, and a new trial granted.

TITONE, J. P., MANGANO and WEINSTEIN, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered December 1, 1980, reversed, on the law, and new trial granted in accordance herewith, with costs to abide the event.