■ MARGARET O'SHEA, Appellant, v ANTHONY J. SARRO, Respondent. — In a medical malpractice action, plaintiff appeals from a judgment of the Supreme Court, Kings County (Scholnick, J.), dated June 10, 1983, which, upon a jury verdict, is in favor of defendant and against her.

Judgment reversed, on the law, and new trial granted, with costs to abide the event.

In this medical malpractice action, plaintiff Margaret O'Shea alleged that defendant, Dr. Anthony J. Sarro, severed or damaged her spinal accessory nerve when he performed surgery in January, 1979 to remove enlarged lymph nodes from her neck. This resulted in the atrophy of the trapezius muscle in her right shoulder, which is innervated by the spinal accessory nerve. Plaintiff testified that she began to experience pain across the top of her right shoulder almost immediately after the operation and this pain became progressively worse and radiated down to her shoulder blade, as well as down her right arm. She noticed that her right shoulder had begun to droop during the summer of 1979 and this fact was substantiated by photographs which were taken of her at that time and introduced into evidence. Plaintiff eventually left defendant's care after a visit to him in October, 1979, and, thereafter, sought the advice of other physicians at the Downstate Medical Center and Columbia-Presbyterian Medical Center. She underwent two subsequent operations to repair and strengthen the muscles in her right shoulder to correct some of the damage allegedly caused by defendant. The two medical experts who testified on behalf of plaintiff, a neurologist, and a head and neck surgeon, stated that, in their opinions, defendant was responsible for the damage to her right trapezius muscle by partially or totally severing the spinal accessory nerve during the surgery he performed in January, 1979. Defendant denied that he had injured plaintiff's spinal accessory nerve during the operation, as it was located considerably deeper than the site from which he removed the lymph nodes. He acknowledged, however, that plaintiff complained of pain in her right shoulder when, subsequent to her release from the hospital, she visited his office in late January and early March, 1979. Dr. Sarro recalled that when plaintiff returned to his office in late January, early March and late June, 1979, he asked her to shrug her shoulders and to raise her arms above her head to determine whether her right trapezius muscle was

functioning properly and stated that she was able to perform these exercises with no difficulty. But he acknowledged that during plaintiff's last visit to his office in October, 1979, he noticed that plaintiff's right trapezius muscle showed signs of atrophy and that her right shoulder had begun to droop. At this time, plaintiff had great difficulty in shrugging her shoulders and was only able to raise her right arm to a horizontal position. Defendant immediately suspected that the atrophy of plaintiff's trapezius muscle had resulted from damage to her spinal accessory nerve. He opined that plaintiff's spinal accessory nerve had not been damaged by his surgery, but by a gradual process whereby the nerve had become enmeshed or entrapped in scar tissue, thereby inhibiting it from conducting impulses to the trapezius muscle. Dr. Maurice Cohen, the expert witness who testified on behalf of the defense, substantiated defendant's position by stating that, in his opinion, the functions of plaintiff's spinal accessory nerve had been compromised over a period of time, either by the infiltration of scar tissue or "reactive hyperplasia", a disease involving the increased activity and enlargement of the lymph nodes. The jury returned a unanimous verdict for the defendant.

We conclude that the judgment in favor of defendant should be reversed and a new trial granted due to the prejudicial impact on plaintiff's case of several errors at trial. The Trial Judge committed reversible error by permitting defense counsel, over the strenuous objections of plaintiff's trial attorney, to propound hypothetical questions to his expert witness, Dr. Cohen, and to cross-examine Dr. John Antunis, a neurologist affiliated with Columbia-Presbyterian Medical Center, whom plaintiff subsequently consulted, concerning the significance of alleged "findings" made by Dr. Kenneth Raymond Phelps, an internist affiliated with the Downstate Medical Center (hereinafter Downstate), whom plaintiff had also consulted, and two of his colleagues who did not testify at trial. According to defense counsel, Dr. Phelps and his colleagues, the chairmen of the neurology and internal medicine departments at Downstate, found that plaintiff was fully capable of shrugging her shoulders and raising her right arm above her head, indicating that her spinal accessory nerve was stimulating her right trapezius muscle, when they examined her in November, 1979. It was highly improper for defense counsel to ask his expert witness a hypothetical question assuming the existence of alleged "findings" by the three doctors at Downstate which were not fairly inferable from the evidence in the record (see *Tarlowe v Metropolitan Ski Slopes,* 28 NY2d 410, 414). There is no indication, either in the testimony of Dr. Phelps or his medical records, that he asked

plaintiff to shrug her shoulders or to raise her arms above her head in order to test the functions of the trapezius muscle in her right shoulder. The records of Dr. Phelps' examinations of plaintiff in November, 1979 state only that he had plaintiff perform exercises to test muscles in her arms other than the trapezius muscle. Indeed, the existence of any findings by Dr. Phelps or his colleagues that plaintiff had the complete use of her trapezius muscle in November, 1979 is belied by the statement in Dr. Phelps' records that he observed plaintiff's right trapezius muscle to be "wasted", and by defendant's own testimony that plaintiff was unable to shrug her shoulders properly and to raise her right arm above her head when he examined her in October, 1979, approximately one month prior to her first visit to Dr. Phelps. Although there is some evidence that Dr. Phelps may have consulted with his colleagues in arriving at a diagnosis for plaintiff, there is no indication that these other doctors personally examined plaintiff and observed her shrug her shoulders and raise her arms above her head.

It has generally been held that "opinion evidence must be based on facts in the record or personally known to the witness * * * He cannot reach his conclusion by assuming material facts not supported by evidence" (*Cassano v Hagstrom,* 5 NY2d 643, 646; see, also, *Lipsius v White,* 91 AD2d 271, 279; *Stracher v Corning Glass Works,* 39 AD2d 560, 561). Although expert witnesses have been permitted to base their opinions, in part, upon facts contained in medical records and other out-of-court statements (see *People v Sugden,* 35 NY2d 453), they may not rely primarily upon the opinions by physicians who were not called as witnesses at trial, such as the colleagues of Dr. Phelps (see *Borden v Brady,* 92 AD2d 983). In formulating his opinion that the damage to plaintiff's spinal accessory nerve resulted from causes other than defendant's negligence in performing the surgery, Dr. Cohen relied, to a large extent, upon the erroneous assumptions in the hypothetical questions propounded by defense counsel that examinations by three physicians at Downstate revealed that plaintiff was able to use her trapezius muscle approximately 11 months after the operation. Therefore, the opinion of the only expert witness called by the defense was not properly accepted for consideration by the jury, as it was grounded in speculation rather than an adequate factual basis on the record (see *Lipsius v White,* 91 AD2d 271, 279, *supra; Matter of Aetna Cas. & Sur. Co. v Barile,* 86 AD2d 362; *Cross v Board of Educ.,* 49 AD2d 67, 70; *Filanowicz v Guarino,* 27 AD2d 666).

Additionally, the Trial Judge erroneously permitted defense counsel to take advantage of his cross-examination of plaintiff's

witness, Dr. Antunis, to call the jury's attention to highly prejudicial distortions and misrepresentations of the testimony and medical records of Dr. Phelps (see *Zeleznik v Jewish Chronic Disease Hosp.*, 47 AD2d 199, 207-208; *Diaz v Williams*, 22 AD2d 873). Defense counsel reinforced the prejudicial impact of those distortions of important evidence presented to the jury when he repeatedly referred to the alleged findings of Dr. Phelps and his colleagues at Downstate throughout his summation (see *Diaz v Williams, supra; Fuller v Hudson Transp. Co.*, 275 App Div 985; *Regan v Frontier Elevator & Mill Co.*, 211 App Div 164; cf. *Taggart v Alexander's, Inc.*, 90 AD2d 542).

Lastly, the Trial Judge abused his discretion when he denied the application of plaintiff's counsel to recall Dr. Phelps as a rebuttal witness, after both sides had rested, to correct defense counsel's misrepresentations of his findings concerning the ability of plaintiff to perform exercises involving the use of her trapezius muscle. The proposed testimony of Dr. Phelps described in the offer of proof made by plaintiff's counsel was proper rebuttal, as it would have refuted the existence of the alleged findings, which defense counsel not merely endeavored to prove as affirmative facts, but actually requested his expert to assume without proving (see *People v McCann*, 90 AD2d 554, 555; *Yeomans v Warren*, 87 AD2d 713; *Hutchinson v Shaheen*, 55 AD2d 833, 834). Under these circumstances, it was important that plaintiff's counsel be permitted to recall Dr. Phelps in the interest of justice to correct distortions of his testimony and of the medical records, which were relevant to major issues in the case, and which his opposing counsel emphasized repeatedly to the jury (cf. *Kaplan v Central Med. Group*, 71 AD2d 912).

It is highly probable that the aforesaid errors influenced the jury's verdict for the defense, in view of the closeness of the evidence supporting the conflicting theories of the parties and the fact that defense counsel's misrepresentation of the findings of Dr. Phelps and his colleagues constituted one of the primary bases of the opinion of the only medical expert called by the defense. Thompson, J. P., O'Connor, Niehoff and Boyers, JJ., concur.