DINA CRUZ, Individually and as Parent and Guardian of Moises Cruz, an Infant, Appellant, v MADISON DETECTIVE BUREAU, INC., Respondent and Third-Party Plaintiff. RKO CENTURY THEATRES, Third-Party Defendant-Respondent.

First Department, May 12, 1988

## APPEARANCES OF COUNSEL

*Robert C. Agee* of counsel *(Fitzgerald & Fitzgerald, P. C.,* attorneys), for appellants.

*Anthony M. Fischetti* of counsel *(Garbarini & Scher, P. C.,* attorneys), for respondent and third-party plaintiff.

*Gerald V. Esposito* of counsel *(Esposito, Giordano & Buchicchio,* attorneys), for third-party defendant-respondent.

## OPINION OF THE COURT

Asch, J.

Moises Cruz, employed as an usher, was attacked by patrons in a movie theatre owned and operated by third-party defendant RKO Century Theatres (RKO). This action was brought against defendant Madison Detective Bureau, Inc. (Madison), based on its alleged negligence in failing to provide adequate security at the theatre and in failing to follow its own security procedures. After a five-day trial, at the close of plaintiffs' direct case, the court granted a motion by defendant Madison and third-party defendant RKO to dismiss the action.

Brian Camp, one of the Madison guards on duty on the night of the incident, testified that he had been assigned to the theatre as "houseman", meaning that he was "in charge of that theatre for security". The only formal training given to him by Madison was the proper way to hold a nightstick. He had no prior experience as a security guard before being hired by Madison, four months before the assault. One of his duties at RKO was to guard the box office on the ground floor, for the purpose of protecting the receipts. Camp testified that, in addition, the security staff was responsible for crowd control, supervising lines to make sure people proceeded in an orderly fashion. Also, he and other guards would check upstairs in the theatres and bathrooms to make sure exit doors were closed and that no one was smoking, selling or taking drugs, or

"whatever". At times, there did occur various "disturbances" in the theatre. They were "little things", including patrons who were smoking or blocking exit doors. Further, Camp caught some people "line jumping"—going from one theatre to another on the premises, where a different motion picture was being exhibited, without paying an additional admission price.

Camp testified that on the night of the incident three security guards, including himself, were on duty. All three were downstairs near the box office, not on the upper floor where the doors to the different theatres were located. At one point, the ticket taker at the theatres above urgently shouted to Camp to come upstairs. Camp ran upstairs with only one other guard, leaving the third at the box office. Three or four men were assaulting Cruz. After a short altercation between the guards and the men who had been assaulting Cruz, someone called out that the police were coming, and the men left.

Salvatore Parete, the manager of the RKO-86th Street theatre, who had hired Madison to furnish guards at the theatres, testified that he trained and directed the guards "in such things as crowd control". He testified that the two movies showing on the night of the incident were "Superman" and "Octopussy", which were "blockbusters" bringing in lots of people. Extra guards were sought at such times when it was anticipated that the theatre would be busy. One of the considerations in obtaining such extra security was for the protection of the patrons and employees. Parete testified that his instructions to Camp were to have two guards on the upper level when the movies were ending and the crowds letting out.

The assistant manager of the theatre, Thomas Utz, testified that when three guards were on duty, at least one of them was supposed to be upstairs patrolling the theatre. He said plaintiff and Tony Howell, another theatre employee, were attacked when they attempted to prevent some patrons, after one movie had ended and that theatre was emptying, from going into the other theatre without paying. Utz testified the only guard he saw upstairs was Camp, who was trying to stop the assault.

Tony Howell, at the time of the incident, was the candy stand attendant and performed other duties. He testified that on the night in question the two movies "broke" simultaneously. At that time, Howell "saw two guys going over to the other side". After Howell asked the men, coming out of one

theatre and going into the other, for their ticket stubs, he and plaintiff were attacked. When the attack began, there was no guard upstairs although the theatre was crowded.

Edwin Guerra, another usher on duty that night, confirmed that there was no guard upstairs prior to the attack. He testified that Camp was outside the theatre, when he went to get him, at the time that plaintiff was being assaulted.

Plaintiff Moises Cruz testified to the same effect as Howell, that some men had attempted to go from one theatre to another without paying. When thwarted, the group surrounded plaintiff and Howell and started to punch and to kick them. Cruz reported that he had previously witnessed similar incidents in which people tried to go from one theatre to the other. He, as well as the other employees of RKO, had been instructed to seek assistance from the guards in the event of any trouble.

Plaintiff sought to introduce the testimony of Michael Wright, who was employed as an acting supervisor of security guards, by the Madison Detective Agency, in the area covering the theatre at the time of the incident. Wright had been summoned to the theatre immediately after the attack occurred. Plaintiff's counsel sought to qualify Wright as an expert so that his testimony would support the claim of the lack of adequate security at the theatre and the lack of training given the guards. He would also serve as a notice witness as to prior disturbances or criminal acts at the theatre and as a fact witness as to the occurrences on the night of the incident. The court refused to allow Wright to testify as an expert witness or on the other issues.

After the completion of the plaintiffs' case, the court granted Madison's and RKO's motion to dismiss the complaint for failure to establish a prima facie case.

A motion to dismiss the complaint at the close of plaintiff's case should not be granted unless it is clear that by no rational process could the jury find in favor of plaintiff *(O'Neil v Port Auth.,* 111 AD2d 375, 376). The trial court was obliged to view the evidence in a light most favorable to plaintiffs, giving them the benefit of every inference which could reasonably be drawn from the facts presented at trial and resolving all questions as to witnesses' credibility in plaintiffs' favor *(Lipsius v White,* 91 AD2d 271, 276).

A prima facie case for negligence requires plaintiff to show the existence of a duty owing by defendant to the plaintiff,

defendant's failure to discharge that duty, and an injury to plaintiff proximately resulting from such failure *(Peresluha v City of New York,* 60 AD2d 226, 230).

■ Applying these principles to the facts presented herein, it is clear plaintiffs made out a prima facie case. Thus, testimony was adduced that defendant Madison was hired to furnish security at the RKO theatre and that part of this security responsibility entailed furnishing guards for crowd control and crime prevention at the upper level, where the theatres were located, especially at times when the movies had ended and crowds were leaving. While there was testimony by Madison's employee, Camp, that his primary duty was to protect the cash receipts located on the ground floor, defendant RKO's employees, Parete and Utz, flatly denied that any such instruction was given to Madison on behalf of RKO. Accordingly, the jury might well have found that Madison and/or its employees disobeyed RKO's directives.

Further testimony corroborated that none of the guards were on duty upstairs at the time of the incident, in disregard of RKO's instructions that at least one be on duty there at all times. The evidence concerning the way in which Cruz received his injuries established, either directly or by fair inference, that these injuries resulted from defendant Madison's breach of its duty to control the crowds and prevent disturbances on the upper level. The jury could reasonably have found that Camp's failure to follow directions and take precautionary measures in the face of a foreseeable risk constituted negligence vicariously attributable to Madison *(see, Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507, 520). From the evidence presented, the jury could have determined that Madison was negligent because of the inadequate training in proper security techniques and procedures which Camp received and also the inadequate supervision and poor placement of the guards at the theatre. " 'One who collects a large number of people for gain or profit must be vigilant to protect them' " *(Philpot v Brooklyn Natl. League Baseball Club,* 303 NY 116, 121). The inadequate supervision and security afforded patrons and employees by Madison plainly showed a complete lack of such vigilance *(see, Antinucci v Hellman,* 5 AD2d 634, *lv denied* 5 NY2d 705; *see also,* Annotation, *Liability of Owner or Operator of Theatre or Other Amusement to Patron Assaulted by Another Patron,* 75 ALR3d 441, and cases cited therein).

Although the injuries to the plaintiff Cruz were caused by

third parties, the jury reasonably could have found that this attack should have been foreseen by defendant Madison and was proximately caused by Madison's original, wrongful acts. Thus, a determination by the jury that the attempt of the third parties to sneak into a theatre without paying and the subsequent assault were set in motion by the negligence of Madison in failing to provide adequate security on the upper level. As we have previously noted, "[w]here the acts of the defendant give rise to a series of events culminating in injury to another, such acts are all held the proximate cause" *(Di Sabato v Soffes,* 9 AD2d 297, 305; *see also,* Annotation, *Private Person's Duty and Liability for Failure to Protect Another Against Criminal Attack by Third Person,* 10 ALR3d 619, 630 § 5).

Accordingly, under the circumstances present, the disruptive acts of third parties herein were, accepting plaintiffs' proffered testimony, ordinary and foreseeable—a direct result of defendant's negligence. From the facts testified to by the plaintiff and other witnesses, the jury could certainly infer that the intervening acts were foreseeable since there was evidence of various types of criminal activity *(cf., Nallan v Helmsley-Spear, Inc., supra).* The issues of foreseeability, the duty owed plaintiff, and proximate cause were questions of fact which the jury should have been permitted to decide in this case *(see, Derdiarian v Felix Contr. Corp.,* 51 NY2d 308).

■ Trial Term further erred in excluding all the proffered testimony of plaintiffs' expert witness, Wright. Initially, it was improper to bar testimony by Wright as to the facts surrounding this incident and as to his knowledge of prior and unruly behavior, especially where the court later ruled that lack of proof of notice was fatal to plaintiffs' prima facie case. Further, it appears from the record before us that this witness met the threshold requirement for qualification as an expert and the court, therefore, abused its discretion in refusing to allow him to testify in that capacity as to standards of security *(see, Karasik v Bird,* 98 AD2d 359).

Accordingly, the judgment of the Supreme Court, Bronx County (Barrett A. Hickman, J.), entered September 29, 1987, dismissing the complaint of plaintiffs and the third-party complaint after presentation of plaintiffs' direct case, should be reversed, on the law and facts, and the matter remanded for a new trial, with costs and disbursements payable to plaintiffs.

Sullivan, J. P., Milonas, Kassal and Ellerin, JJ., concur.

Judgment, Supreme Court, Bronx County, entered on September 29, 1987, unanimously reversed, on the law and facts, and the matter remanded for a new trial. Appellants shall recover of respondents submitting briefs one bill of $75 costs and disbursements of this appeal.