[606 NYS2d 621]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
TYRONE KELSEY, Appellant.

First Department, January 18, 1994

### APPEARANCES OF COUNSEL

*Martin M. Lucente* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Luke Martland* of counsel *(Carol A. Remer-Smith* with him on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

Defendant's conviction arises out of a "buy-and-bust" operation on the upper east side of Manhattan. On April 11, 1990, at approximately 2:30 P.M., Detective Schoberle, a member of a tactical narcotics team (TNT), dressed "like a regular street person", approached a group of men standing by a mailbox on the corner of 100th Street and Third Avenue and asked if "anybody was working." Defendant, one of the group, asked, "How many you looking for?" When Schoberle replied, "[F]ive", defendant told him to walk to a fence "a few feet" north on Third Avenue. After walking to the fence, Schoberle turned around and saw defendant approaching. Defendant handed Schoberle five yellow-topped vials in exchange for $15 in prerecorded buy money. The entire transaction lasted three or four minutes.

Meanwhile, Schoberle's "ghost", Detective Melinda Acosta, who had followed Schoberle to 100th Street and Third Avenue, watched as he approached the men near the mailbox and saw him approach defendant. Fearing that she was too close to Schoberle and that she might jeopardize the operation, Acosta turned around and walked east towards a housing project. She had walked only about 20 feet when a man approached her and "made an offer." "Out of habit", Acosta went along "with the transaction" and purchased three vials from another man, who removed them from a brown paper bag. As a result of her involvement in this transaction Acosta lost sight of Schoberle and did not witness his purchase of narcotics.

After completing her own buy, Acosta walked back to the car which she and Schoberle had parked and where Schoberle

was waiting for her. He radioed his field supervisor, Sergeant Clarke, that he had made a "positive buy" and gave a detailed description of the seller, his clothing and his location. After Clarke gave the order to "move in", three other members of the team, including Detective Kane, drove to the scene, arriving there in approximately two minutes, and saw defendant, who fit Schoberle's description, standing with another man, later identified as James Green. Two other men stood a "few feet away" in front of the men who were involved in the transaction with Detective Acosta. As Kane jumped from his car, Green dropped a paper bag, which, when retrieved, was found to contain loose "rock" cocaine. A second bag, containing 36 blue-topped vials of crack cocaine, was recovered from Green's jacket pocket. Defendant was searched at the scene; although $28 was recovered from him, he did not have any of the prerecorded money in his possession. Nor did defendant have any drugs on him. Green, also searched, was not in possession of any of the buy money. Green, defendant, and the two men who had sold drugs to Detective Acosta were arrested and placed near the curb. Two or three minutes later Schoberle and Acosta made drive-by identifications, Schoberle identifying defendant and Acosta identifying the two that sold her drugs.

Defendant produced an alibi witness, who provided little comfort to his cause. An acquaintance of some 15 years, she testified that on the day of his arrest she met him at a laundromat on Third Avenue between 100th and 101st Streets and that he left sometime "between 2:00 and 2:30 p.m." The jury found defendant guilty of criminal sale of a controlled substance in the third degree, as charged.

Defendant does not challenge either the sufficiency or the weight of the evidence. He does, however, argue, *inter alia,* that his right to a fair trial was violated by the repeated use of evidence as to what generally happens in buy-and-bust operations as well as evidence suggesting drug activity at the scene of arrest by James Green. In that regard, the prosecutor introduced evidence of the general procedures of a buy-and-bust operation as well as the change in tactics adopted by drug dealers to avoid being apprehended with the incriminating buy money or drugs on their person. For instance, Sergeant Clarke, the People's first witness, testified that "TNT is a street level narcotics enforcement unit" whose objective is "to arrest street level drug dealers, usually in residential areas." He described the specific function of each member of

the TNT team, including the supervisor, the undercover and the back-up officers and explained that the selection of TNT-targeted areas was based on "complaints from the community * * * the Board of Education * * * [and] churches".

Clarke was permitted to explain that in a buy-and-bust operation undercover officers use prerecorded buy money to purchase narcotics but that since many drug dealers are aware of this, they "exchange the money or pass the money off to someone else." Similarly, Clarke testified, the dealer's supply of drugs, the "stash", is "[n]ot necessarily" on his person, but often hidden nearby. At one point during his testimony, the trial court instructed the jury that it was allowing "background information * * * to enlighten you as to what happened in this particular case." The court denied defendant's mistrial motion, noting that the evidence was relevant because "[defendant] didn't have buy money on him when he was arrested."

The next witness, the undercover officer, Detective Schoberle, testified that prior to the time of the instant sale, the police used to "find stash and cash on people." By the time of the sale, he noted, dealers "were working within groups. One person would deal you the narcotics, another person would take the money. Another person would take the stash. So it was a group of people working together." Therefore, he indicated, officers making an arrest "wouldn't recover stash or * * * buy money" as often as they had in the past.

The arresting officer, Detective Kane, over defense objection, further developed this theme through his testimony that Green, the man next to defendant at the time of his arrest, was holding a bag full of drugs and had more drugs on him. After defense counsel elicited on cross-examination that the vials recovered from Green had blue tops, while those sold by defendant to Schoberle had yellow tops, Kane was recalled to testify that there was nothing unusual in the fact that the tops of the vials sold were one color, while the tops of the vials in the stash were of another. Schoberle was also recalled and confirmed Kane's testimony that "there's nothing unusual about" the difference in the colors of the vial tops. On recall, Schoberle testified that only "fifty percent of the time" was the prerecorded buy money recovered from the seller; Kane testified that recovery of the buy money occurred "less than fifty percent" of the time.

While "[a] defendant is entitled to have the jury determine

his guilt or innocence solely upon evidence tending to prove the crime charged and uninfluenced by irrelevant and prejudicial facts and circumstances" *(People v Cook,* 42 NY2d 204, 208), this Court has made it clear that evidence regarding buy-and-bust procedures is admissible if it "help[s] to provide the jury with an understanding of the officers' behavior" or is probative with respect to a "contested issue." *(People v Almodovar,* 178 AD2d 133, *lv denied* 79 NY2d 943; *People v Ramos,* 192 AD2d 324, *lv denied* 81 NY2d 1078.) As defendant concedes, such testimony enables the jury to understand the evidence and follow the sequence of events in a particular case. It is, of course, axiomatic that the admissibility of testimony, including the scope of direct and redirect examination, is a matter within the discretion of the trial court. *(Cf., People v Ocasio,* 47 NY2d 55, 60; *People v Duffy,* 36 NY2d 258, 262-263, *mot to amend remittitur granted* 36 NY2d 857, *cert denied* 423 US 861.)

Under such a standard the general background evidence elicited from Sergeant Clarke concerning the normal buy-and-bust operation, the objectives of TNT and the roles of each member was clearly admissible to enable the jurors to place the testimony of Schoberle, Acosta and Kane in context. Other than to complain about the evidence that TNT teams target specific areas based on community complaints, which we do not find prejudicial to defendant, defendant does not specifically challenge this evidence. Rather, he challenges as unduly prejudicial the testimony of Clarke, Schoberle and Kane about the tactics drug dealers use to avoid being apprehended in possession of either the stash or the cash. In particular, he complains that this evidence diverted the jurors' attention away from the single sale at issue, focussing it instead on the narcotics trade in general.

As the Trial Judge correctly realized, however, the challenged testimony as to how drug dealers worked within groups so that TNT teams would not find the drug supply or any buy money on them was relevant, given the absence of either drugs or prerecorded money on defendant at the time of his arrest. That street-level drug dealers had adopted a *modus operandi* to compete with TNT's tactics is not common knowledge to the average citizen. This Court has impliedly recognized as much in holding that testimony as to the various roles in a typical drug operation is admissible to explain the absence of the prerecorded buy money on a defendant at arrest. *(See, e.g., People v Gonzalez,* 180 AD2d 553, *lv denied*

79 NY2d 1001; *People v Ellsworth,* 176 AD2d 127, *lv denied* 79 NY2d 856; *People v Roman,* 171 AD2d 562, *lv denied* 77 NY2d 1000.) Only by testimony that drug sellers systematically pass off buy money and work in conjunction with others who hold the drugs could the jury place in perspective the absence of any prerecorded buy money or drugs on defendant. And, of course, this evidence was relevant to a contested issue. Defense counsel repeatedly asked Schoberle why the TNT team used prerecorded buy money and if any such money was recovered from defendant. Defense counsel made the point even more explicit in summation, stressing both the absence of drugs or buy money on defendant at the time of arrest.

While this general background testimony and even the explanation as to the absence of drugs or buy money on defendant at the time of the arrest was proper, the People were allowed too much latitude as to the latter issue. It is one thing to offer an explanation for the absence of buy money or drugs on a defendant at the time of arrest. It is quite another to offer evidence that in the testifying officer's experience such evidence is not recovered in 50% of the drug arrests. Once the explanation was offered as to the various roles played by the integrated group connected to the seller, the jury had all the information it needed to account for the absence of drugs or prerecorded money in defendant's possession at the time of arrest. The introduction of evidence of the practices drug dealers have used on other occasions may not be used to prove defendant's conduct on this particular occasion. The statistical evidence had nothing to do with this case and carried with it undue prejudice.

Furthermore, the testimony about Green, who was standing next to defendant at the time of arrest and who was arrested with him, dropping a bag of loose "rock" cocaine and carrying a second bag containing 36 vials of crack cocaine was irrelevant and prejudicial. There was no evidence placing Green in the immediate vicinity at the time of the sale. Nor, given the testimony as to how drug dealers operate, was the testimony as to the amount of drugs he possessed material, especially since there was no testimony that he and defendant were acting together. In fact, according to the police officers' testimony, no buy money was found on Green. Nor was there any evidence that Green supplied defendant with the five yellow-topped vials that defendant sold to Schoberle. In light of the extensive amount of testimony given on current "stash and cash" practices, which would have provided the jury with the

necessary explanation as to why defendant was in possession of neither, there was no need to inform the jury that at the time of arrest defendant was standing next to a virtual one-man drug store. The evidence could serve no purpose other than to prejudice defendant unnecessarily. Even if Green's temporal proximity to defendant and his own conduct and subsequent arrest were "inextricably interwoven" *(People v Vails,* 43 NY2d 364, 368) with the events at the time of defendant's arrest, the testimony regarding Green should have been limited so as to avoid any references to the contents of both the bag he dropped and the bag which he was carrying at the time of the arrest. *(See, e.g., People v Crandall,* 67 NY2d 111, 114, 117; *People v Ortiz,* 142 AD2d 248, 250-252.)

Since we do not find the erroneous admission of the prejudicial matters to have been harmless, a new trial is in order.

Accordingly, the judgment of the Supreme Court, New York County (Stephen Crane, J.), rendered May 27, 1992, convicting defendant, after a jury trial, of criminal sale of a controlled substance in the third degree and sentencing him, as a predicate felony offender, to an indeterminate term of from 5 to 10 years, should be reversed, on the law, and the matter remanded for a new trial.

CARRO, ROSENBERGER, ROSS and ASCH, JJ., concur.

Judgment, Supreme Court, New York County, rendered May 27, 1992, reversed, on the law, and the matter remanded for a new trial.