[667 NYS2d 692]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM COLON, Appellant.

First Department, December 30, 1997

## APPEARANCES OF COUNSEL

*Jacqueline M. Vernon* of counsel, Bronx *(Stanley R. Kaplan* on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

*George P. Chang* of counsel, New York City, *pro hac vice (Joel B. Atlas, Robert S. Dean* and *Adrienne Gantt* on the brief; *Daniel L. Greenberg,* attorney), for appellant.

## OPINION OF THE COURT

MURPHY, P. J.

Defendant was tried upon an indictment charging him with third degree criminal possession and sale of a controlled substance. Both counts of the indictment arose out of a single transaction in which defendant allegedly sold one glassine envelope of heroin to an undercover officer. At defendant's trial, the undercover officer testified that after observing defendant pass a glassine envelope to a woman, he approached the defendant and said "uno", whereupon defendant, in exchange for a marked 10 dollar bill, handed him a glassine envelope. Immediately after this sale, a description of the seller was transmitted by the undercover to the officer who, minutes later, arrested defendant. Contrary to the expectation naturally arising from the undercover officer's testimony, however, the arresting officer testified that a search of defendant incident to his arrest disclosed only 10 dollars in unmarked currency; neither drugs nor buy money was recovered.

To the aforementioned testimony, the prosecutor added the testimony of a third police officer, who was presented to the jury as an expert in street-level narcotics transactions. This officer's lengthy testimony, spread out over some 17 pages of the record, went into considerable detail about how street-level conspiracies to sell drugs were typically structured: a "steerer" directed customers to a "pitcher", who would obtain the drugs to be sold on an as-needed basis from a "stash man" and pass them to the buyer. The proceeds of such transactions were delivered with some frequency to a "money man" and might thereafter be laundered at stores "fronting" for the conspiracy. All of this activity was safeguarded by "lookouts" and supervised by "managers" or "owners", who would periodically replenish the street-level operation's supply of product. This particular division of labor was employed, according to the expert, to minimize the risk of detection and successful prosecution by reducing the probability that the most exposed members of the conspiracy would, if apprehended, be found in possession of either drugs or buy money.

Defense counsel lodged timely objections to the admission of this expert testimony claiming, *inter alia*, that the testimony was unnecessary to explain the simple hand-to-hand transaction at issue and that it would encourage the jury to speculate baselessly that defendant was a member of a well-orchestrated conspiracy to traffic in narcotics. The trial court, however, determined that the expert testimony was admissible for the limited purpose of explaining why neither buy money nor additional narcotics had been found on the defendant at the time of his arrest and so instructed the jury.

We are of the view that the trial court erred in admitting the expert testimony and that the consequence of this error was to deny the defendant a fair trial.

It is "settled and unquestioned law that opinion evidence must be based on facts in the record or personally known to the witness [citations omitted]. He cannot reach his conclusion by assuming material facts not supported by evidence [citation omitted]" (*Cassano v Hagstrom*, 5 NY2d 643, 646, *rearg denied* 6 NY2d 882; *see also, Gomez v New York City Hous. Auth.*, 217 AD2d 110, 117). It follows, then, that our approval of the introduction of expert testimony bearing upon the machinations of street-level drug-dealing operations to explain the absence of buy money and drugs upon a defendant when arrested where the defendant had been observed in possession of such items at the time of a recently concluded sale, must be premised upon the existence of a factual basis for the opinion typically offered by prosecution experts in such cases; if an expert is to attribute the failure to recover drugs and buy money from a defendant to the workings of a conspiracy, there must be some evidence that there was in fact a conspiracy. Traditionally employed principles of the law of evidence simply do not permit the fact finder to entertain a hypothesis without factual grounding and here the requisite factual fundament for the receipt of the hypothesis proposed by the People's expert was missing. There was no evidence that the seller in this case acted in concert with anyone to effect the sale with which defendant was charged. Indeed, there was not a scintilla of proof interpretable as indicative of the involvement of a "steerer" or a "stash man" or a "money man" or a "lookout" or a "manager" and we do not think that the involvement of such functionaries may be reliably hypothesized by an a expert or inferred by a jury simply because no drug money or contraband was found on the defendant.

An obvious explanation for the absence of drugs and buy money on an individual arrested for a very recent sale of

narcotics to an undercover officer who observed such items in the seller's possession at the time of the transaction is that the wrong person was arrested. Indeed, unless the police are presumed to be infallible in the context of "buy-and-bust" operations—and such a presumption, apart from being highly dubious empirically, would be legally impermissible in the context of a criminal trial—there is no reason to suppose that the inference of misidentification a fact finder might well draw from the prosecution's own evidence in a case such as the one before us, would, as the People repeatedly suggest, necessarily, or even likely, be attributable to "confusion". And, in the absence of any factual basis to characterize this entirely rational inference as one born of confusion, we can perceive no permissible role for expert opinion. Expert testimony is admissible only insofar as it may assist the jury to understand the significance of the evidence properly before it when that evidence is not readily interpretable by a layperson (*see, People v Taylor*, 75 NY2d 277, 288-293; *People v Cronin*, 60 NY2d 430, 432-433). It is not a means of establishing basic facts not yet in evidence and as to which the expert is not competent to testify (*see, Cassano v Hagstrom, supra*; *O'Shea v Sarro*, 106 AD2d 435, 437; *Lipsius v White*, 91 AD2d 271, 279), or for placing before the jury a wholly speculative explanation to conceal a gap or inconsistency in proof (*see, Lipsius v White, supra*; *Matter of Aetna Cas. & Sur. Co. v Barile*, 86 AD2d 362). Accordingly, where, as here, there was no reason to suppose that the significance of such evidence as there was of the transaction at issue was beyond the grasp of the average juror, expert testimony was not admissible to explain how a conspiracy, if it had existed, might have accounted for the absence of drugs and buy money on defendant's person at the time of his arrest. The mere fact that the jury in performing its traditional function of choosing between such competing inferences as were justified by the evidence might have embraced an inference with exculpatory consequence did not justify the conclusion that the jury was confused and in need of expert guidance. The provision of such "guidance" in a situation where the need of it had not been established constituted a palpable intrusion upon the rightful and exclusively held prerogative of the fact finder to draw conclusions from the evidence (*see, People v Cronin, supra*, at 432).

The prejudicial consequence of admitting the testimony of the prosecution's expert—effectively inviting the jury to infer conspiratorial involvement from what otherwise might have

been perceived as an exculpatory circumstance—cannot be overstated. Indeed, it is highly unlikely that even a meritorious claim of misidentification, as defendant's may well have been, could have prevailed in the face of a speculative onslaught of the sort to which the expert's testimony in this case gave license.

Although the receipt of the expert's testimony constitutes a sufficient ground for reversal, we address a remaining appellate point raised by defendant since it presents an issue that may well arise when defendant is retried.

Contrary to defendant's contention, we believe the trial court's partial closure of the courtroom during the testimony of the undercover officer to have been proper. The undercover officer testified at the *Hinton* hearing that he continued to be involved in buy-and-bust operations in the vicinity of defendant's arrest, which occurred within 10 blocks of the courthouse. In this connection, the undercover stated that he had only the previous day purchased narcotics in that same area; that he had four or five open cases arising from purchases he had made in that location; and that he would continue to work in that location in the immediate future. This testimony, we think, does not materially differ from that found by the Court of Appeals to justify closure in *People v Pearson* (82 NY2d 436). There, the undercover officer identified a specific location readily accessible from the courthouse where the defendant had been arrested and where the officer had made numerous other arrests and would continue to work extensively *(supra,* at 443). Citing these circumstances, the Court of Appeals observed, "We cannot say that the trial court abused its discretion in concluding that * * * testifying in an open courtroom might endanger the undercover officer's safety" *(supra,* at 443). Given the similarity of the factual predicate here involved, a different conclusion as to whether the trial court's discretion respecting courtroom closure had been properly exercised would be anomalous. Nor, given the sufficiency of the predicate for closure of the courtroom during the testimony of the undercover officer in this buy-and-bust case, was it incumbent upon the court *sua sponte* explicitly to consider alternatives to closure *(People v Ayala,* 90 NY2d 490; *People v Pearson, supra).* Moreover, it is more than impliedly clear *(see, People v Ayala, supra,* at 504) that the trial court in this case did in fact consider alternatives to total closure since the defendant's family and friends were in the end permitted to remain in the courtroom during the undercover officer's testimony.

Our conclusion that the trial court did not err in closing the courtroom based upon the circumstances as they were at the time of defendant's first trial upon the instant indictment, however, should not be read to preclude a different resolution of the closure issue when defendant is retried. By that time, of course, the circumstances relevant to closure may well have changed.

Accordingly, the judgment of the Supreme Court, Bronx County (Martin Marcus, J.), rendered September 19, 1994, convicting defendant, after a jury trial, of criminal sale of a controlled substance in the third degree, and sentencing him to an indeterminate prison term of 6 to 12 years, should be reversed, on the law and in the interest of justice, and the matter remanded for a new trial.

ANDRIAS, J. (dissenting). I dissent and would affirm.

Defendant's principal argument on appeal is that Sergeant McDonald's expert testimony about street-level narcotics operations "impermissibly associated appellant with the on-going *organized* drug trade, depriving him of his due process right to a fair trial" (emphasis added).

Initially, such claim has not been preserved for appellate review. The sergeant's direct examination consisted of 18 pages of testimony. Other than referring to his pretrial objections when the prosecution sought to have Sergeant McDonald qualified as an expert, defense counsel's *only* objection at trial was to a specific question about what sellers do after a hand-to-hand narcotics sale. This objection was apparently addressed to *the form* of the question, which called for personal, anecdotal evidence.

Contrary to defendant's assertions here, his counsel's pretrial objections were likewise not addressed to expert testimony about sophisticated narcotics operations but to claims that the proffered testimony would be anecdotal, not beyond a jury's common understanding, and not based on science, tests or studies; that the witness might not in fact qualify as an expert; that there was no showing that the proffered evidence (on how several individuals might conduct a street-level operation) would apply here because defendant was observed alone with no others aiding him; and, that this evidence would invite the jury "to speculate that there was a whole network of people *out on this street* in this case" (emphasis supplied).

While Sergeant McDonald did make occasional references to larger scale drug operations and organizations, this occurred

as the prosecutor developed his expertise. As noted above, there was no objection to this testimony. Furthermore, these references were general and unrelated to the defendant and were necessitated by the defense's pretrial challenge to the sergeant's expertise. In any event, any prejudice that may have occurred because of references to narcotics organizations in the sergeant's direct examination was eliminated on cross-examination when he was asked:

"Q. Now let's get this straight. You don't know anything about what happened on June 22, at 167th and Sherman, right?

"A. No.

"Q. You weren't involved in that case at all?

"A. No, I wasn't.

Q. *In fact, Mr. Colon is not part of some long term investigation that you were describing in your direct examination?*

"A. *No, he is not.*" (Emphasis supplied.)

In addition, the court attempted to cure any potential prejudice to defendant by drafting a limiting instruction for the jury. Defendant did not object to the court's charge and only requested that the instruction be read in the court's final charge to the jury instead of at the end of Sergeant McDonald's testimony. Thus, defendant has waived any claim that the court's instruction did not cure the alleged prejudice from the sergeant's testimony (*see, People v Santiago*, 52 NY2d 865, 866).

In actuality, apart from qualifying his expert, the prosecutor's questioning of Sergeant McDonald regarding his knowledge of street-level narcotics operations was relatively brief and to the point ("brief and limited testimony concerning street sales in general was admissible to explain why the 'buy' money was not recovered" (*People v Gonzalez*, 180 AD2d 553, 554, *lv denied* 79 NY2d 1001).

The majority finds that "the requisite factual fundament for the receipt of the hypothesis proposed by the People's expert was missing. There was no evidence that the seller in this case acted in concert with anyone to effect the sale with which defendant was charged". In fact, however, it could be argued that had there been testimony about others acting with defendant on the street (a hawker, a stash man, a banker, etc.), the expert evidence would be improper because it would be unnecessary and would only impermissibly bolster the obvious proof that a jury could interpret without expert testimony. It is where a defendant is arrested shortly after an alleged one-on-one sale

without drugs or money that expert testimony is warranted. As noted in *People v Kelsey* (194 AD2d 248), the leading discussion of the issue, however prevalent street-level drug dealing is in our City, the average juror is not familiar with the *modus operandi* of street-level dealers (*supra*, at 252).

There is no basis in the facts of *Kelsey* (or any other reported case) to limit expert evidence of street-level operations to instances where there is evidence of others involved in the sale. For example, in *Kelsey*, while the defendant was hanging out with other denizens of 100th Street and Third Avenue, he alone left the crowd to sell to the undercover officer one-on-one. Furthermore, as the Court found, the man next to Kelsey when he was arrested, one James Green, who was found in possession of a large quantity of narcotics, had no relationship to Kelsey. It was not the expert testimony about drug operations, but the references to the stranger Mr. Green and the expert's testimony that in only "fifty percent of the time" was prerecorded buy money recovered from a seller, that warranted reversal there.

Here, as the majority points out, the defense was that since defendant had no drugs or buy money, the "wrong person was arrested". However, this is the same argument that this Court in *Kelsey* found appropriate to counter with expert testimony about street-level dealing: "Only by testimony that drug sellers systematically pass off buy money and work in conjunction with others who hold the drugs could the jury place in perspective the absence of any prerecorded buy money or drugs on defendant. And, of course, this evidence was relevant to a contested issue. Defense counsel repeatedly asked Schoberle why the TNT team used prerecorded buy money and if any such money was recovered from defendant. Defense counsel made the point even more explicit in summation, stressing both the absence of drugs or buy money on defendant at the time of arrest" (*supra,* at 253).

Defendant's additional claim that the expert testimony bolstered the undercover officer's testimony is raised for the first time on appeal and is thus unpreserved (*see, People v Garcia*, 83 NY2d 817, 819).

Finally, defendant contends that he was deprived of a fair trial when the trial court permitted testimony that the arresting officer observed a drug transaction between defendant and an unidentified woman and that the prosecutor erroneously used such evidence to show defendant's propensity to commit such crimes. Again, defendant's claim is unpreserved because

he failed to specify at trial that the admission of uncharged crimes evidence deprived him of a fair trial (*see, People v Iannelli*, 69 NY2d 684).

In any event, the claim is without merit. It is well settled that although evidence of uncharged criminal conduct or bad acts may not be adduced at trial solely to demonstrate criminal propensity, it is admissible when offered for some relevant purpose, if the probative value outweighs any prejudicial effect (*People v Till*, 87 NY2d 835, 836). In fact, evidence of uncharged crimes may be relevant to demonstrate intent, motive, knowledge, common scheme or plan, or identity of the defendant (*People v Alvino*, 71 NY2d 233, 242). In addition, such evidence has also been deemed admissible for the legitimate purpose of clarifying the circumstances surrounding a defendant's arrest and to complete the narrative of the charged crime (*People v Gines*, 36 NY2d 932, 933).

At trial, the undercover officer testified that he saw defendant standing on the corner of 167th Street and Sherman Avenue talking to an Hispanic woman. As he got closer, the officer observed defendant hand one glassine to the woman, who then walked away. The officer approached defendant and said "uno" to defendant who, without saying anything, immediately handed one glassine to him in exchange for $10 of prerecorded buy money. At this point, the court instructed the jury that the officer's testimony of defendant's prior exchange with the Hispanic woman was only to explain why he said "uno" to defendant and why he expected defendant to understand that he wanted to purchase one glassine of heroin.

Such testimony of defendant's prior uncharged drug transaction was properly admitted to explain the course of conduct between the officer and defendant. Before trial, the court stated that the prosecutor could use such testimony reasoning that "the use of this other transaction is necessary to explain what is otherwise inexplicable conduct, and for that limited purpose I'm prepared to receive it into evidence". The court then stated that it would give a limiting instruction to clarify the purpose of the evidence.

The probative value of this testimony regarding defendant's uncharged drug sale outweighed any prejudicial effect to him and amounted to nothing more than background information to complete a coherent narrative of defendant's arrest and to avoid jury speculation about the actions of the police (*see, People v Crespo*, 203 AD2d 182). As the trial court properly held, the testimony was essential to explain the undercover of-

ficer's conduct in approaching defendant and saying "uno" to him (*see, People v Brown*, 211 AD2d 405). Moreover, since defendant's defense was that he was erroneously arrested, the officer's testimony that defendant had just sold to another customer was properly admitted to counter defendant's contention that the police seized the wrong man (*see, People v Marte*, 207 AD2d 314, 316).

MILONAS, ROSENBERGER and WALLACH, JJ., concur with MURPHY, P. J.; ANDRIAS, J., dissents in a separate opinion.

Judgment, Supreme Court, Bronx County, rendered September 19, 1994, reversed, on the law and in the interest of justice, and the matter remanded for a new trial.